**Althea DAVIS, Appellant,**

v.

**STATE UNIVERSITY OF NEW YORK, Anna Boyle, Director of Nursing (Downstate Medical Center), and individually, Lorraine Pohutsky and Theresa Dela Vega, individually, Appellees.**

No. 1055, Docket 85–7907.

United States Court of Appeals, Second Circuit.

Argued * April 30, 1986.

Decided Oct. 3, 1986.

against her express wishes. She was present in the courtroom during the entire April 3 session. We then granted her motion to argue pro se, and oral argument was heard by the original panel on April 30, 1986.

Althea Davis argued pro se (Lawrence S. Cumberbatch, New York City, filed brief for appellant).

Ellen Fried, Asst. Atty. Gen. (Robert Abrams, Atty. Gen., Judith T. Kramer, Vida M. Alvy, Asst. Attys. Gen., New York City, of counsel), for appellees.

Before LUMBARD, OAKES, and NEWMAN, Circuit Judges.

OAKES, Circuit Judge:

Althea Davis, a black nurse, filed a complaint in the United States District Court for the Eastern District of New York in January 1982, charging her employer, Downstate Medical Center of the State University of New York ("DMC"), and certain individuals with racial discrimination in failing to promote her in late 1978. Following her discharge from DMC in April 1982, she amended her complaint to charge that she was isolated at work and eventually discharged in retaliation for bringing the discrimination charges.[1] After a five-day

---

1. Both parties consented to the referral of this action to a United States Magistrate for all purposes, including the entry of judgment, 28 U.S.C. § 636(c)(1) (1982), and agreed that an

640

bench trial, Magistrate John L. Caden found that Davis failed to prove that defendants discriminated against her in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e–2, –3 (1982) ("Title VII"), either in not promoting her or in discharging her.[2] Specifically, the magistrate found that Davis's employer adequately explained its conclusion that another applicant was more qualified than Davis for the promotion and that Davis failed to show that the selection was racially motivated. He also concluded that DMC articulated several legitimate reasons for discharging appellant, including her inability to work with others and low productivity, and that Davis failed to prove that the termination was linked to her filing of charges of racial discrimination. On appeal, Davis argues that appellees' articulated reasons for not promoting her are unworthy of credence, and that the evidence shows that, as a matter of law, her discharge was retaliatory.

We summarize the facts as found by the magistrate. Davis began her employment for DMC in June 1977. At that time Davis had master's degrees in nursing and nursing education. In 1978 appellee Anna Boyle became the director of nursing services and, as such, Davis's supervisor. In the summer of 1978 the position of associate director of in-service education became vacant. A search committee screened the applicants, but its role was only advisory, the final decision resting with Boyle. The committee consisted of two white women, including defendant Pohutsky, defendant Dela Vega, who is of Philippine origin, and a black woman. After interviewing all the candidates,[3] the committee recommended, in order of preference, Karen Sherman, a white woman, Cynthia Mock, and Rafello Aleto, both Asian women. The committee minutes reflect that none of the other candidates were considered "viable" for the position. Boyle interviewed the three recommended candidates and she also interviewed Davis, under the "affirmative action" policy of interviewing all in-house employee-applicants. Boyle then selected Sherman. The committee guidelines called for a master's degree in nursing; Sherman had a master's in education but had done her teaching, assignments, and papers on nursing. Boyle considered the degree to be equivalent to a master's with a clinical nursing major. Sherman's supervisory and in-service experience surpassed appellant's. The magistrate credited Boyle's testimony that she concluded that Sherman's education and experience made her the best qualified candidate.

Following the appointment of Sherman, appellant filed a complaint with DMC's affirmative action officers, who found no "conclusive evidence" of discrimination after an investigation.[4] She then filed a race

appeal would be directly to the United States Court of Appeals, id. § 636(c)(3). On defendant's motion for partial summary judgment the magistrate dismissed Davis's section 1983 claim as barred by the statute of limitations, and her section 1981 and state law fraud claims for failure to state a claim. Magistrate Caden noted that "defendants conceded that the Title VII claims are actionable" and "[t]herefore, the court takes no position at this time regarding [those] claims." He then "dismiss[ed] defendant SUNY–DMC as a party defendant" on grounds of Eleventh Amendment immunity. Appellant challenges none of these rulings on appeal. Trial proceeded only on the Title VII claims. We assume that because Magistrate Caden stated that he did not address the Title VII claims in his summary judgment order and because a state and its agencies have been subject to suit under Title VII since 1972 and have no Eleventh Amendment immunity, see Fitzpatrick v. Bitzer, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); 42 U.S.C. § 2000e(b) (1982), he did not intend to dismiss DMC as to the Title VII claims. We therefore treat the DMC as an appellee here.

2. Magistrate Caden dismissed defendant Lorraine Pohutsky on the ground of insufficient service of process. He dismissed defendant Theresa Dela Vega because Davis's proof wholly failed to support a finding that the search committee, or any individual on it, was racially biased. These dismissals are not appealed.

3. Karen Sherman was interviewed only by Pohutsky.

4. A faculty member of the College of Nursing, Sadie Smalls, ranked three candidates based on a "blind test" review of their resumes. She ranked Davis as the strongest candidate and Sherman as the weakest. The magistrate found

discrimination complaint with the New York State Division of Human Rights ("SDHR"). In January 1980 the SDHR issued a finding of probable cause.

As a result of conflict between Davis and Sherman, her new supervisor, Boyle reassigned Davis in April 1979 to be an instructor in the Department of Medicine, which included a promotion in rank and salary. Conflicts soon developed between appellant and the head nurses concerning line authority and appellant's role. In an attempt to resolve this problem, Boyle assigned Davis to study the relationship between supervisory staff and those outside of line management, such as clinical specialists. After concluding her research in February 1980, Davis told Boyle that the real problem in the Department of Medicine was racial discrimination. Boyle concluded that the problems Davis had experienced were solely due to her personality. At this time, about one month after SDHR's probable cause finding, Boyle began to document conflicts between Davis and hospital staff in appellant's personnel file. She also delayed Davis's return to her former position in the Department of Medicine. In March 1980, Davis filed another complaint with the SDHR charging retaliation for her prior complaint. Appellant continued to supervise two nursing students and devoted substantial time to completing the work of a committee of which she was the chairperson. In October 1980, Davis returned to the Department of Medicine, but in a new role that did not include orienting nurses and that did not require her to interact with supervisory staff. In March 1981, Boyle prepared a performance evaluation of appellant that recommended nonrenewal of her contract because of lack of ability to work with others and low productivity, as well as poor organizational knowledge, adaptability, and judgment. In March 1982, Boyle again recommended nonrenewal of Davis's contract because of poor response to her in-service program and the absence of certification of any nurse attending her collaborative practice programs. Davis was terminated on April 22, 1982.

## DISCUSSION

■ It is not disputed that Davis made out a prima facie case of race discrimination in the hospital's failure to promote her. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). The hospital, however, met its burden of producing a "legitimate, nondiscriminatory reason for the employee's rejection." *Id.* First, no member of the selection committee recommended appellant for the job; indeed, she was "not considered viable for this position" by the committee. Second, Boyle explained the basis for concluding at the time of her decision that Sherman was the best-qualified candidate. She also adequately explained why she considered Sherman's master's degree in education to be equivalent to a master's in nursing. Finally, the committee, as to which there was no proof of discrimination in its deliberations, recommended Sherman as its first choice. The employer need not prove that the person promoted had superior objective qualifications, or that it made the wisest choice, but only that the reasons for the decision were nondiscriminatory. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 258–59, 101 S.Ct. 1089, 1096–97, 67 L.Ed.2d 207 (1981); *Lieberman v. Gant*, 630 F.2d 60, 65 (2d Cir.1980); *Powell v. Syracuse University*, 580 F.2d 1150, 1156–57 (2d Cir.), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978).

■ After the employer has shown a "legitimate, nondiscriminatory reason" for its action, the employee must demonstrate that the articulated reason is a pretext. *See McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825. The ultimate burden of persuasion remains at all times with the employee. *See Burdine*, 450 U.S. at 253,

that Smalls knew she was reviewing appellant's resume, that she had worked with appellant and had written a letter of reference for her, and that she was influenced in favor of candidates with degrees from New York schools.

101 S.Ct. at 1093. Ultimately, the district court "must decide which party's explanation of the employer's motivation it believes." *United States Postal Service Board of Governors v. Aikens*, 460 U.S. 711, 716, 103 S.Ct. 1478, 1482, 75 L.Ed.2d 403 (1983). Appellant argues that DMC's stated reasons for failing to promote her are unworthy of credence. The magistrate, however, believed the evidence presented by appellees that Sherman was hired because she was the best candidate. The requirement of Fed.R.Civ.P. 52(a) that factual findings will be set aside only if clearly erroneous and that due regard will be given to the trial court's opportunity to judge the credibility of witnesses applies with equal force to Title VII cases. *See, e.g., Martin v. Citibank*, 762 F.2d 212, 217 (2d Cir.1985). Appellant presented no evidence to show that the committee or Ms. Boyle was racially biased. In short, the reasons for hiring Sherman were not so ridden with error that appellees could not have honestly relied upon them. *See Lieberman*, 630 F.2d at 65. As the magistrate found, the record does not support appellant's contention that the failure to promote her was based, in whole or in part, on racial animus.

■ Appellant's allegation that appellees discharged her in retaliation for filing the race discrimination charges with the SDHR in violation of section 704(a) of the Civil Rights Act, 42 U.S.C. § 2000e–3(a) (1982), rests on a different footing. A finding of unlawful retaliation is not dependent on the merits of the underlying discrimination complaint. *See Sims v. Mme. Paulette Dry Cleaners*, 580 F.Supp. 593, 594 (S.D.N.Y.1984) (citing *EEOC v. Kallir, Phillips, Ross, Inc.*, 401 F.Supp. 66, 70 & n. 6 (S.D.N.Y.1975), *aff'd without published opinion*, 559 F.2d 1203 (2d Cir.), *cert. denied*, 434 U.S. 920, 98 S.Ct. 395, 54 L.Ed.2d 277 (1977)). The order of proof in a retaliation case follows the *McDonnell Douglas* standard. *See Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980). Title VII is violated if "a retaliatory motive play[ed] a part in the adverse employment actions," *id.*, even if it was not the sole cause. *See, e.g., Abel v. Bonfanti*, 625 F.Supp. 263, 268 (S.D.N.Y.1985); *Sims*, 580 F.Supp. at 596 & n. 9. The magistrate properly found that Davis made out a prima facie case of retaliation: Appellant engaged in protected activity, i.e., the filing of the state discrimination charges; appellees were aware of that activity; she suffered adverse employment decisions; and the protected activity was closely followed by adverse actions, such as denial of a merit pay increase and documentation of conflict in appellant's file. *See Grant*, 622 F.2d at 46; *Sims*, 580 F.Supp. at 598 & n. 23.

■ Appellees then sought to demonstrate legitimate, nondiscriminatory reasons for the discharge. Evidence credited by the magistrate was to the effect that Davis had serious conflict with other nurses in positions of authority. These conflicts resulted in appellant's move to the Department of Medicine in April 1979, her removal from that department in October 1979, and the postponement of her scheduled return in February 1980 until October 1980. The record also supports findings that Davis's work productivity was low, that she did not accept supervision, that she responded to conflict with angry correspondence, often over relatively trivial matters, and that staff nurses responded poorly to appellant's in-service programs.

■ Once the employer establishes a legitimate, nondiscriminatory motive, the presumption of retaliation drops from the case and the employee must demonstrate that the stated reasons were pretextual. *See Burdine*, 450 U.S. at 255 & n. 10, 256, 101 S.Ct. at 1094 & n. 10, 1095. Again, the trier of fact must ultimately decide which party's explanation of the employer's motivation it believes. *Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482. The magistrate explicitly stated that he believed the reasons given by the appellees for the discharge were the true reasons, and rejected appellant's claim that the stated reasons were pretextual.

It is true that the magistrate's opinion does not discuss what at first blush seems

a significant admission by Boyle.[5] In response to a question on cross-examination as to whether appellant's filing of charges with the SDHR had any impact on what she did in her official capacity, Boyle responded:

A. I can say no or I can comment.

Q. I permit you to comment.

[A.] Then my comment would be that I would not want to de-emphasize the weight of importance or significance of Ms. Davis or anyone filing charges or cases or there being rules or there being schedules. That is terribly important. It was derrogatory [sic] on a personal level, on an institutional level, it was a serious problem.

But I insist that my truth is that Ms. Davis was a problem on this subject.

This testimony may be read to suggest that Boyle had retaliatory motives—personal and institutional—in her dealings with appellant. The question, of course, is whether these retaliatory motives "play[ed] a part in the adverse employment actions." *Grant*, 622 F.2d at 46. The magistrate stated that he believed appellees' explanation for the discharge, and he rejected appellant's version of events, though he did not refer to this piece of testimony as to Boyle's state of mind. The evidence otherwise supports a finding of no retaliation. While we could remand to the magistrate for further findings on this issue, a reading of the testimony immediately following that noted above clarifies what Boyle was really saying sufficiently to permit affirmance. She went on to say:

She [Ms. Davis] was not the problem. She was not the problem.

Q. What was the problem?

A. There were two problems.

The one problem that I lived with and worked with day in and day out, I had three priorities and my first priority was to stabilize the situation.

Q. That was back in '78?

A. It was four years. It was through 1980. It was to bring a halt and closure to conflict and resolution, and while it was a stormy period, it was critical to me that I contain it to the leadership staff and not allow it to spill down and involve the staff nurses.

And some of it for the first year was role related and then it came through as an issue of racial discrimination.

While much has been said about the impact of Ms. Davis' case for me at a working level on a day-to-day basis, I must insist Ms. Davis was a problem, but not the problem.

And on the issue of racial discrimination, for me it started before I knew she filed a case with certainty.

And another individual had me totally lost to my purpose, hearing her opinions of accusations about a head nurse. And I would investigate the case. And I did that three times and I wrote massive reports of the findings of my investigations and my conclusions.

And I spent the month of August of '79 and over a Labor Day weekend, talking on the phone to the personnel officer saying I need the assistance of Ms. Ragowsky. And he would say, she is on vacation; she is away for the whole month. I asked if there was a designee or backup. He said no, she's away. What will I do with this report, that was the first. He said send it there to him and there were three. Ms. Ryan, Constance Ryan, had me being detective for a month.

When I felt it was intolerable and I shouted on the phone to the personnel officer, my third conclusions, she was creating cases. My number one, my number two, I could find absolutely no evidence to validate her opinion, and, number three, as extreme that it was, and I verbalized it to Mr. Schwalbach, my opinion was she was creating cases. And I shouted at the phone and asked

---

5. The State likewise failed to discuss this evidence in its brief, despite the emphasis placed upon it by appellant.

why would she do that and I learned and I concluded why she would do that, because she filed an official charge at the Human Rights Association on August 10. And these cases began to pour in after.

So Ms. Davis was a problem, but she was not the problem. Ms. Ryan was the problem and she connected with Ms. Davis later and in my eyes, Ms. Davis was part of an already identified issue that at this point was not with any individual. And any charge, any case, any ruling, any schedule that was or took the issue outside of the institution for me personally or in a role capacity, was no problem, because I had the capacity to go out there and speak and be heard or be right or be wrong. It could be out there.

My purpose was to order that situation and preserve the integrity of an institution that was delivering care of a critical nature and couldn't be absorbed in the working day arguments, accusations, violence, assault, and there are stories that probably will never be heard. But it was a violent climate and I received resignations that says one could not tolerate the violent, emotional environment of this institution.

Ms. Davis was a problem. No way was she the problem.

My answer to the question is no.

Read in context and as a whole, this testimony, if credited as the magistrate did credit it in his findings, demonstrates that it was the atmosphere of acrimony threatening the integrity of the institution that was *the* problem for Ms. Boyle, not the filing of official charges which, as she said, "was no problem, because I had the capacity to go out there and speak and be heard or be right or be wrong."

Judgment affirmed.

JON O. NEWMAN, Circuit Judge, concurring:

I concur in Judge Oakes' thorough opinion but write separately to clarify what I believe courts mean in saying that a claim of discrimination will be upheld if discriminatory or retaliatory motive "played a part" in an employer's decision to discharge an employee or take other adverse employment action. The problem concerns dual motivation and the standards for dealing with that problem set forth by the Supreme Court in *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 287, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977).

In most cases involving claims of discrimination, the issue of dual motivation does not arise. After the plaintiff presents a *prima facie* case of discrimination, the burden shifts to the employer to come forward with a "legitimate, nondiscriminatory reason" for the adverse action. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). At that point the burden is upon the employee to prove that the articulated reason is a pretext. *Id.* at 804, 93 S.Ct. at 1825. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 258–59, 101 S.Ct. 1089, 1096–97, 67 L.Ed.2d 207 (1981). Typically, the issue confronting the fact-finder at this last stage of the sequence is to determine which reason motivated the adverse action—the nondiscriminatory reason articulated by the employer or the discriminatory reason alleged by the employee. On occasion, however, the fact-finder might conclude that the employer was not motivated solely by either reason and that in truth both reasons "played a part" in the employer's decision.

In *Mt. Healthy* the Supreme Court faced the dual motivation issue in the context of adverse employment action taken because of both a legitimate reason concerning deficient work performance and an illegitimate reason concerning exercise of free speech rights. The Supreme Court instructed that once the employee proves that the illegitimate reason played a part in the employer's motivation, the employer loses unless the employer can persuade the fact-finder that the adverse action would have been taken even in the absence of the illegitimate reason. Or, to put it another way, the employer can prevail by proving that the adverse action would have been taken

if the legitimate reason alone had existed. Recently the Court has made it clear that the *Mt. Healthy* approach to dual motivation applies in the context of racial discrimination. *See Hunter v. Underwood,* 471 U.S. 222, 105 S.Ct. 1916, 1920, 85 L.Ed.2d 222 (1985).

Even before *Hunter* and *Mt. Healthy* the Court had indicated that a plaintiff does not win a Title VII suit simply by showing that race or other improper consideration was in the mind of the employer. Though the employee need not show that he would have been discharged solely on the basis of race, without regard to legitimate reasons, he must show "that race was a 'but for' cause." *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 2580 n. 10, 49 L.Ed.2d 493 (1976).

It is in light of these pronouncements that we must understand the language Judge Oakes' opinion quotes from *Grant v. Bethlehem Steel Corp.,* 622 F.2d 43, 46 (2d Cir.1980), to the effect that a retaliation claim is established if "a retaliatory motive play[ed] a part in the adverse employment actions." As is clear from the full sentence from which the quoted language is taken, the words "play[ed] a part" are used to explain the required *causal connection* between the employer's adverse action and the employee's prior invocation of Title VII protections.[1] A retaliatory motive "plays a part" in an adverse employment decision only when it is causally connected to the adverse action or, in the language of *McDonald,* when it is the "but for" cause of the adverse action. As elucidated in *Mt. Healthy,* the improper reason is the "but for" cause only if the adverse action would not have been taken "but for" the improper reason; the improper reason is not causally related to the adverse action if that action would have been taken in any event in the

absence of the improper reason. *See NLRB v. Charles Batchelder Co.,* 646 F.2d 33, 41 (2d Cir.1981) (Newman, J., concurring). Only in this sense of causal relationship is a retaliatory motive significant to a discrimination claim when such motive "played a part," along with some other motive, in the decision to take adverse action.

In a case of dual motivation in the Title VII context, a question remains whether the burden is on the employer to prove that it would have taken the adverse action if only the legitimate reason had existed, as *Mt. Healthy* suggests in the First Amendment context, or on the employee to prove that the employer would not have taken the adverse action if only the legitimate reason had existed, as the *McDonald* footnote states concerning Title VII. However this issue is eventually resolved, it should be clear that a retaliatory motive or other impermissible discriminatory reason does not establish a Title VII violation unless it was causally related to the adverse action, not merely in the mind of the employer. Showing that the impermissible factor was in the mind of the employer along with some legitimate reason only raises the dual motivation issue but does not resolve it. Of course, in many, perhaps most, cases, the existence of a retaliatory or other illegitimate motive will cast grave doubt on the plausibility of whatever legitimate motive the employer alleges motivated the adverse employment action.

---

1. The full sentence reads as follows:
   Both sides agree that in order to establish such a claim, the plaintiff must show: first, protected participation or opposition under Title VII known by the alleged retaliator; second, an employment action or actions disadvantaging persons engaged in protected activi-

ties; and third, a causal connection between the first two elements, that is, a retaliatory motive playing a part in the adverse employment actions.
   *Grant v. Bethlehem Steel Corp., supra,* 622 F.2d at 46.