739 F.Supp. 97 (1990)
Susan F. McLAUGHLIN, Plaintiff,
v.
STATE OF NEW YORK, GOVERNOR'S OFFICE OF EMPLOYEE RELATIONS; New York StateCouncil 82/AFSCME Joint Committee on Quality of Working Life; Council 82/AFSCME; Thomas A. Gibbs; Joseph Puma; and Richard Bischert, Defendants.
No. 89-CV-924.
United States District Court, N.D. New York.
June 11, 1990.
*98 O'Connell and Aronowitz (Jeffrey D. Honeywell, E. Michael Ruberti and David M. Cherubin, of counsel), Albany, N.Y., for plaintiff.
Robert Abrams, Atty. Gen. of State of N.Y. (Randolph F. Treece, Asst. Atty. Gen., of counsel), Albany, N.Y., for State defendants.
Rowley Forrest O'Donnell & Hite, (Richard R. Rowley, David C. Rowley and James J. Seaman, of counsel), Albany, N.Y., for defendants Council 82, Puma and Bischert.

MEMORANDUM-DECISION AND ORDER
McCURN, Chief Judge.

I. Introduction
Plaintiff claims that she was the victim of discrimination and harassment on the basis of gender which adversely impacted upon the conditions of her employment and ultimately led to her dismissal as a staff member of the New York StateCouncil 82/AFSCME Joint Committee on Quality of Working Life (the "QWL Committee"). Moreover, plaintiff asserts that she was *99 the victim of unlawful retaliation as a result of her filing of complaints under Title VII. This suit has been brought pursuant to Title VII of the Civil Rights Act of 1964 with particular reference to 42 U.S.C. §§ 2000e-2(a), (c) and 2000e-3(a).[1] A central legal issue presented by the defendants' motion to dismiss, or in the alternative for summary judgment, is whether and to what extent this litigation is barred by the prior decision and factual findings of a New York State Court. The State Court previously granted the defendants summary judgment on numerous tort claims asserted by the plaintiff which arose out of the same factual scenario that is presently before this court. The state court decision, however, did not address plaintiff's Title VII sex discrimination and retaliation claims. Also important to the resolution of these motions is the degree to which plaintiff's claims are barred by the applicable Title VII limitations period.

II. Background

A. The Parties
The complaint names as defendants Joseph Puma, President of the New York State Inspection, Security and Law Enforcement Employees, District Council 82 of AFSCME, ("Council 82"); Council 82; Richard Bischert, the Executive Director of Council 82 (sometimes the "Union" defendants); Thomas Gibbs, an Assistant Director of the New York State Governor's Office of Employee Relations (the "GOER"); the GOER; and the New York StateCouncil 82/AFSCME Joint Committee on Quality of Working Life; (sometimes the "State" defendants).[2] The QWL Committee is an entity which was created as a result of collective bargaining negotiations between Council 82 and the GOER. It appears that the QWL Committee was operated as a joint organization of labor and management to administer funds provided under the collective bargaining agreement (the "CBA")ostensibly to improve the working conditions of negotiating unit employees.
Plaintiff asserts that the QWL Committee was governed by a four-person executive committee comprised of two representatives of Council 82 and two representatives of the State of New York. This body *100 had authority over the funding and approval of major projects as well as the hiring and firing of QWL Committee personnel. Complaint par. 25; Plaintiff's Mem. of Law at 5. As a result of the offices they held with Council 82, defendants Puma and Bischert were the union representatives on the executive committee.[3] The Commissioner of the Department of Correctional Services and the Director of the GOER were the State's representatives on the executive committee. Id. Defendant Gibbs was one of the State's negotiators in contract talks with Council 82negotiating with Puma and Bischert, among others. Moreover, Gibbs was allegedly the state officer responsible for the administration of the labor contract with Council 82. Complaint at 27; Plaintiff's Mem. at 6.
Plaintiff, Susan McLaughlin, was employed as an Employee Program Associate with the QWL Committee from January of 1983 to May of 1988when the staff of the QWL Committee was disbanded. Plaintiff claims to have been earning $42,944.00 at the time her position was terminated. Id. at 22. According to the Union defendants, McLaughlin has returned to an "encumbered" position with the N.Y.S. Office of Mental Retardation and Developmental Disabilities where she now earns a yearly salary of $36,253.00. Union Defs.' Mem. at 1.

B. The Complaint
On August 26, 1987, and again on June 20, 1988, plaintiff filed written complaints with the New York State Division of Human Rights alleging unlawful discrimination by the defendants. Both of the administrative complaints were dual-filed with the Equal Employment Opportunity Commission. The State Division of Human Rights made a determination adverse to plaintiffyet plaintiff did not take an appeal from this decision to the Appellate Division of the New York State Supreme Court. Plaintiff claims to have received notice of the EEOC's negative conclusion with respect to her claims and of her right to bring suit within ninety (90) days, on May 3, 1989. The complaint in the present action was filed on July 28, 1989.
There are two causes of action stated in the complaint. The first cause of action alleges that all of the defendants engaged in or cooperated with sexually discriminatory and retaliatory conduct which adversely affected the terms and conditions of plaintiff's employment with the QWL Committeeall in violation of 42 U.S.C. §§ 2000e-2(a) and (c). Plaintiff asserts generally that defendants Puma and Bischert engaged in physical and verbal sexual harassment of the plaintiff while Puma, Bischert, and Gibbs together retaliated against the plaintiff for filing sex discrimination complaints. Complaint par. 21. The complaint further contends that the QWL Committee, Council 82, and the GOER are liable to the plaintiff because those entities knew or should have known of the discriminatory conduct and took no action to prevent it. Moreover, it is asserted that these entities may be held liable due to the "inherent complicity present due to the senior status" of Puma, Bischert and Gibbs within these organizations. Id. at 23. Paragraphs 30 through 45 of the complaint state numerous particular acts of discriminatory conduct on the part of the various defendants. On this motion for summary judgment the plaintiff has further supplemented the record with affidavits which both buttress these allegations and allege additional conduct on the part of the defendants which she believes to be discriminatory or retaliatory in nature.
The second cause of action asserts that the defendants retaliated against the plaintiff because she filed complaints concerning sexual harassment with the GOER and with the New York State Division of Human Rightsall in violation of 42 U.S.C. § 2000e-3(a). Plaintiff contends that after she filed these complaints the level of harassment, particularly from defendant *101 Gibbs, increased dramatically. See Complaint pars. 53-57. Ultimately, plaintiff believes that Puma, Bischert, and Gibbs acted together to negotiate the QWL Committee out of existence so that they could get rid of the "human rights problem" presented by her claims that she had suffered discrimination on the basis of sex. It is important to note that plaintiff's claims of Title VII retaliation are premised upon the impact the alleged conduct had on the conditions of her employment as well as her termination from employment.

C. Summary Judgment Standard
It is appropriate to grant summary judgment when the record viewed in the light most favorable to the non-moving party presents a situation where there "is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S.Ct. 2505, 2509, 91 L.Ed.2d 202 (1986); United States v. Diebold, Inc., 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962). To survive such a motion, the party opposing summary judgment must provide the court with "`concrete evidence from which a reasonable [trier of fact] could return a verdict in his favor.'" Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2nd Cir. 1988) (quoting Anderson v. Liberty Lobby, 477 U.S. at 256, 106 S.Ct. at 2509).

D. Factual Allegations
On defendants' motion for summary judgment the court must, of course, view the facts in the light most favorable to the plaintiff. It is not disputed that plaintiff began her job as an Employee Program Associate with the QWL Committee in January of 1983working there until May of 1988 when her position was terminated. Throughout this period McLaughlin was given strongly favorable job performance evaluations by the Staff Director and her immediate supervisor, Richard Morris.[4]
The initial allegations of sexual harassment concern defendants Puma and Bischert. Plaintiff contends that on June 2, 1984, she attended a meeting with the members of Council 82's executive committee to discuss a scholarship program. At that meeting plaintiff asserts that she objected to a comment by defendant Bischert that a female candidate who wanted to be a veterinarian was "into screwing animals." In response to her objection Bischert allegedly stated "[t]hat's right, I heard you were into dogs." February 17, 1990, Affid. of McLaughlin par. 6. This statement is substantially corroborated by the affidavit of Frank Benedettowho claims to have been in attendance at the meeting. Benedetto Affid. par. 4. Plaintiff also alleges that on January 26, 1987, after apologizing for her cold hands during a handshake, Bischert pulled her hand toward his midsection stating: "I'll give you someplace to stick them to keep them warm." Feb. 17, 1990, Affid. of McLaughlin par. 24.
Plaintiff contends that she encountered defendant Puma at a bar on July 24, 1984. McLaughlin maintains, that even though she was accompanied the entire time by a friend named David Redder, defendant Puma repeatedly embraced her in a sexually provocative and unwelcome manner causing the plaintiff to move away in order to avoid the contact. Later that evening the plaintiff permitted Puma and his companion to drive herself and David Redder back to her home. Puma and his companion, though uninvited, entered the plaintiff's house. Once inside, plaintiff sat down on her couch to remove her shoes, whereupon Puma reached down, grabbed her feet, and lifted them into the air so as to expose her bottom. Puma then asked the plaintiff if he could stay overnight at *102 her home. February 17, 1990, Affid. of McLaughlin par. 7; McLaughlin SDHR Complaint, Vol. I of SCR at 73-74. These allegations are substantially corroborated by the Affidavit of David Redder. Affid. of Redder par. 4. Plaintiff asserts that a similar series of unwelcome embraces and propositions by Puma occurred at a Council 82 program dinner the next night. This also is corroborated by David Redder.
Plaintiff has supplied an affidavit from Heide Coody, who was formerly employed as an assistant bookkeeper by Council 82, which states that the defendants Bischert and Puma generally referred to plaintiff as "the bitch up the street." Coody Affid. pars. 10-12., Vol. III of SCR at 205. Plaintiff contends that defendant Bischert always addressed her as "boy named Sue" rather than by her proper name. Feb. 17, 1990, Affid. of McLaughlin par. 42.
On September 13, 1985, McLaughlin claims to have received a phone call from Defendant Puma who allegedly made a threatening quid pro quo sexual proposition whereby her future career advancement was tied to sexual favors. Feb. 17, 1990, Affid. of McLaughlin pars. 10-11. To discourage these advances the plaintiff asserts that she told Puma that she was seeing Martin Redderwho was employed as a program associate by the QWL Committee. Four days later, Martin Redder was demoted by the executive committee of the QWL Committee. It is further alleged that on September 30, 1986, defendant Puma summoned plaintiff's immediate supervisor, Richard Morris, to his office in order to reprehend him for appointing the plaintiff as acting director when he was absent from the office. At this meeting Puma allegedly stated: "I don't know what the fuck is wrong with her, maybe she is pissed off because I haven't fucked her yet." It is further asserted that Puma informed Morris that he better "watch it" or he would "be in uniform locking up inmates." Morris Affid., Vol. III of SCR, at 111-12.
Plaintiff next asserts that Bischert and Puma began to use Nancy Wolff, defendant Gibbs, and others, as part of an effort to undermine the plaintiff's employment record. It is asserted that Wolff, who was an employee of the QWL Committee, acted as an informant for Puma concerning the internal operations of the QWL Committee. It is also alleged that Wolff, at Puma's instigation, would periodically lodge complaints concerning the plaintiff's work attitude. For his part, defendant Gibbs allegedly "interrogated" a local Council 82 representative about the plaintiff's work performance even though he had no direct supervisory authority over McLaughlin and that Gibbs "demanded" that the plaintiff's supervisor lower a favorable job performance evaluation. McLaughlin Affid., Vol. III of SCR at 18-19; Feb. 17, 1990, Affid. of McLaughlin pars 16-17.
Plaintiff maintains that the level of harassment increased after she filed an internal sexual harassment complaint with the GOER and with the New York State Division of Human Rights. This increased harassment involved such incidents as Nancy Wolff's filing of a formal complaint concerning the plaintiff's job performance and disputing plaintiff's appointment as acting director. It is also alleged that defendant Gibbs, between December 4, 1987, and January 12, 1988, "investigated" the plaintiff's work performance at the behest of Puma and Bischert. According to Richard Morris, Gibbs threatened to negotiate him out of a job if he did not cooperate with the investigation. Morris Affid. par. 11, Vol. III of SCR, at 113-14.
The plaintiff insists the staff positions at the QWL Committee were eliminated in the 1988 collective bargaining sessions, and the money transferred elsewhere, so as to get rid of the "human rights problem." McLaughlin's position is supported by the affidavit of Lynn Scheiner who was a member of the state's negotiating team at the 1988 collective bargaining sessions. Ms. Scheiner states that:
During discussions concerning the elimination of funding for the QWL Committee ... individuals again referred back to the "human rights problem." It was my clear impression that eliminating funding for the QWL Committee *103 was primarily motivated by the desire of management and union officials to take care of "their human rights problem" and not anything else.

Affid. of Scheiner par. 8, see also pars. 5-10. Further support for this allegation is contained in the Affidavit of Theodore Pettigrass, a Senior Field Investigator for the Department of Correctional Services. Mr. Pettigrass states that he had a conversation with a member of Council 82's negotiating team concerning the elimination of the QWL Committee. According to Pettigrass he was told that the Committee would have to be eliminated to get rid of the "trouble makers." Expressly named as the trouble makers were Susan McLaughlin and Richard Morris. Pettigrass Affid., passim. Plaintiff asserts that all staffers at the QWL Committee received employment with either Counsel 82 or the GOER immediately after the Committee was defunded with the exception of her supporters on the staffnamely Richard Morris and Martin Redder.[5]

E. Prior Action and Decision in State Court
The plaintiff previously filed a suit in New York State Supreme Court, Albany County, alleging tort claims for (1) intentional infliction of emotional distress, (2) prima facie tort, and (3) tortious interference with contract, against Puma, Bischert, Gibbs, and Wolff. See Plaintiff's Second Amended Complaint, Vol I. of SCR pages 14-33. Plaintiff also stated claims for assault and battery against Bischert as well as a claim against Council 82 for negligent hiring and supervision of employees. Many of the same facts which have been alleged in the Title VII action in federal court served as the basis for the state tort suit. However, no claims were asserted in the state court proceeding for sex discrimination or retaliation under Title VII or New York State Human Rights Law, N.Y. Exec. Law § 296.
In a memorandum-decision dated November 1, 1988, Justice Harold Hughes dismissed all of the plaintiff's tort claims. Relevant to the issues presented in this suit are two portions of the relatively short state court decision. With respect to the sex discrimination claims Justice Hughes stated:
Thus at the outset, it is important to recognize that any damages caused to the plaintiff as a result of sex discrimination will be addressed by the Division of Human Rights.
Nov. 1, 1988, Decision of Hughes J., Vol. I of SCR at 7. Later on in his decision Justice Hughes also held that:
The record demonstrates that the reduction in funding for the QWL Committee, and plaintiff's resulting dismissal, were the result of good faith collective bargaining between the union and the state. While some jobs were lost by the QWL Committee, the majority of union members gained by the application of funds taken from QWL to other employee benefits. Plaintiff's innuendo and conjecture to the contrary do not rise to the level of creating a triable issue of fact.
Decision of Hughes J., Vol I of SCR at 9. It should be noted that there has been no discovery to date in either this case or the state court proceeding.

III. Discussion

A. The Prima Facie Case
Plaintiff asserts that the defendants in this suit have violated the provisions of Title VII in three independently cognizable manners: (1) sexual discrimination which created a hostile work environment, (2) quid pro quo sexual harassment, (with respect to defendant Puma) and (3) retaliation, by various means, for filing a complaint and otherwise asserting her rights under Title VII. In response to these claims the defendants have raised the doctrines of issue preclusion (collateral estoppel), claim preclusion (res judicata), and a statute of limitations argument arising out of Title VII's procedural requirements.
*104 Putting aside defendants' affirmative defenses, it is clear that the plaintiff has adequately set forth prima facie claims of Title VII sex discrimination and retaliation against defendants Puma and Bischert, while she has adequately asserted a Title VII claim of retaliation against defendant Gibbs. The plaintiff has asserted a claim pursuant to 42 U.S.C. §§ 2000e-2(a) and (c) which prohibits gender based discrimination as well as a claim under § 2000e-3(a) which bars discrimination for opposing prohibited discriminatory practices or for bringing charges, testifying, assisting, or participating in Title VII enforcement proceedings. As stated by the Second Circuit:
It is well established that the order of proof in a [Title VII] retaliation case follows the rule in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 1824-25 [36 L.Ed.2d 668] (1973): the plaintiff must first establish a prima facie case; the burden then shifts to the employer to articulate some legitimate non-discriminatory reason for the alleged acts of reprisal; and lastly, the burden returns to the plaintiff, who is given an opportunity to demonstrate that the employer's reasons are a mere pretext for discrimination taken in retaliation for participation in protected activities.
Grant v. Bethlehem Steel Corp., 622 F.2d 43, 46 (2nd Cir.1980); see DeCintio v. Westchester County Medical Center, 821 F.2d 111, 115 (2nd Cir.1987).[6]
"To make out a prima facie case of retaliation under Title VII, [the plaintiff] must show: protected participation or opposition [to a discriminatory action] under Title VII known by the alleged retaliator; an employment action disadvantaging the person engaged in the protected activity; and a causal connection between the protected activity and the disadvantageous employment action." DeCintio, 821 F.2d at 115 (emphasis added); see Grant, 622 F.2d at 46. "[A] causal connection can be established indirectly by showing that the protected activity was followed closely by discriminatory treatment ... or through other evidence such as disparate treatment of fellow employees who engaged in similar conduct ... or directly through evidence of retaliatory animus directed against the plaintiff by the defendant." DeCintio, 821 F.2d at 115 (citations omitted). It should be noted that a finding of unlawful retaliation in violation of 42 U.S.C. § 2000e-3(a) is "not dependent on the merits of the underlying discrimination complaint." Davis v. State University of New York, 802 F.2d 638, 642 (2nd Cir.1986).
As a general matter, "[t]o establish a prima facie case of sex discrimination under Title VII, plaintiff is required to show that she was treated less favorably than comparable male employees in circumstances from which a gender based motive could be inferred." Montana v. First Federal Savings and Loan Association of Rochester, 869 F.2d 100, 106 (2nd Cir.1989) (citing Zahorik v. Cornell University, 729 F.2d 85, 93-94 (2nd Cir.1984); Schwabenbauer v. Board of Education, 667 F.2d 305, 309 (2nd Cir.1981)).
Without discussing the factual allegations which have been made by the plaintiff once again, it is evident that she has alleged sufficient facts necessary to support a claim of Title VII sex discrimination and retaliation against both Puma and Bischert. Sufficient facts have also been alleged against defendant Gibbs to support a prima facie Title VII retaliation claim.[7] Moreover, the plaintiff has made out a claim against defendant Puma for what has been termed "quid pro quo" sexual harassment. The elements of a cause of *105 action for quid pro quo sexual harassment are:
(1) The employee belongs to a protected group.
(2) The employee was subject to unwelcome sexual harassment.
(3) The harassment complained of was based upon sex.
(4) The employee's reaction to harassment complained of affected tangible aspects of the employee's compensation, terms, conditions or privileges of employment....
(5) Respondeat superior.
Jones v. Flagship Intern., 793 F.2d 714, 721-22 (5th Cir.1986) (quoting Henson v. City of Dundee, 682 F.2d 897, 909 (11th Cir.1982). Defendant Puma contends that the element of respondeat superior is missing from plaintiff's complaint and, therefore, this claim must be dismissed. At least on this motion for summary judgment, it is evident that Puma's alleged authority as a member of the four-person executive committee of the QWL Committee placed him in a position where he could have a direct impact on the terms, conditions, and existence of plaintiff's employment. Therefore, the element of respondeat superior, along with all the other elements of a quid pro quo cause of action, have been sufficiently alleged against defendant Puma in a manner which makes out a prima facie case.

B. Collateral EstoppelIssue Preclusion
Title 28 U.S.C. § 1738 "requires federal courts to give the same preclusive effect to state court judgments that those judgments would be given in the courts of the state from which the judgments emerged." Kremer v. Chemical Const. Corp., 456 U.S. 461, 466, 102 S.Ct. 1883, 1889, 72 L.Ed.2d 262 (1982). Thus, New York law must be applied to determine the preclusive effect of the state court decision. In Kremer, the Court held that a decision of the New York State Appellate Division, to affirm an administrative determination of the New York State Division of Human Rights, was entitled to a preclusive effect on subsequent attempts by the plaintiff to litigate a Title VII claim in federal court. Id. at 485, 102 S.Ct. at 1899. However, the Court noted that an unreviewed administrative decision by a state agency, such as the N.Y.S. Division of Human Rights, does not preclude trial de novo in federal court of the plaintiff's Title VII claims. Id. at 469-70, 102 S.Ct. at 1891; see also DeCinto v. Westchester County Medical Center, 821 F.2d 111, 114 (2nd Cir.), cert. denied 484 U.S. 965, 108 S.Ct. 455, 98 L.Ed.2d 395 (1987).
The defendants assert that plaintiff's second cause of action, which alleges unlawful retaliation, is barred by the principle of collateral estoppel. Under New York law an individual is barred from relitigating an issue if: (1) the issue as to which preclusion is sought is identical to the issue decided in the prior proceeding, (2) the issue was necessarily decided in the prior proceeding, and (3) the litigant who will be held precluded had a full and fair opportunity to litigate the issue in the prior proceeding. Capital Telephone v. Pattersonville Telephone, 56 N.Y.2d 11, 17, 451 N.Y. S.2d 11, 13, 436 N.E.2d 461, 463 (Ct.App. 1982); see also Ryan v. New York Telephone Co., 62 N.Y.2d 494, 500-01, 478 N.Y. S.2d 823, 826-27, 467 N.E.2d 487, 490-91 (Ct.App.1984). "The burden of establishing the first two elements rests upon the proponent of preclusion, but as to the lack of a full and fair opportunity to contest, the burden is on the opponent." Capital Telephone, 56 N.Y.2d at 18, 451 N.Y.2d at 14, 436 N.E.2d at 464.
The defendants assert that the determination of the state court judge, that "the reduction in funding for the Quality of Working Life Committee, and plaintiff's [McLaughlin's] resulting dismissal were the result of good faith collective bargaining between the union and the state," precludes the plaintiff from asserting in this action that her job was terminated as a result of unlawful sex discrimination or retaliation in violation of Title VII. The union defendants have characterized the second cause of action asserted by the plaintiff as one for retaliatory discharge. On the basis that the state court judge held that the reduction in funds to the QWL *106 Committee was a result of good faith negotiations, defendants assert that the second cause of action should be dismissed.
Plaintiff argues that the state court's finding, even if accepted by this court, would only operate to preclude litigation on the issue of whether the reduction in funding was a retaliatory or sexually discriminatory act. It is asserted that Justice Hughes did not resolve any of the issues concerning the alleged hostile work environment or quid pro quo sexual harassment. Moreover, plaintiff contends that other factors work against the application of the doctrine of collateral estoppel to this case. In the first instance, it is noted that no discovery had been permitted in the state court proceeding prior to the issuance of a summary judgment decision. Secondly, plaintiff cites the development of new evidence, specifically the affidavits of Scheiner and Pettigrass, which provide concrete support for plaintiff's claims of retaliatory discharge. It is also asserted that there is no identity of issues sufficient for the application of issue preclusion. Plaintiff further asserts that Justice Hughes specifically excluded allegations of sex discrimination from his consideration on summary judgment. Moreover, plaintiff maintains that the finding by the state court justice was not necessary to his decision.
Despite her contentions to the contrary, this court holds that the plaintiff is collaterally estopped from relitigating the issue of the reduction in funding of the QWL Committee, and her resultant termination, in this suit. Any errors that might have been committed by the state court (such as a failure to permit discovery, failure to review the record in the light most favorable to the plaintiff, or failure to provide the plaintiff with sufficient time to develop her case) were subject to appealand an appeal was not taken. Plaintiff cannot now contend, in this court, that the state court was not a full and fair forum. Moreover, it is evident that the state court's finding, with respect to the motive behind the termination of plaintiff's position with the QWL Committee, was necessary to a resolution of the cause of action premised on tortious interference with contract. However, the removal of this issue from relitigation does not void either of plaintiff's claims. There are still valid theories with respect to harassment and retaliation, outside of the termination of plaintiff's job with the QWL Committee, which are not barred by the doctrine of collateral estoppel.

C. Claim PreclusionRes Judicata
Both parties agree that the "transactional analysis" approach to claim preclusion (otherwise known as res judicata) is applicable to this suit. Under this analysis, "once a claim is brought to a final conclusion, all other claims arising out of the same transaction or series of transactions are barred, even if based upon different theories or if seeking a different remedy." O'Brien v. City of Syracuse, 54 N.Y.2d 353, 357, 445 N.Y.S.2d 687, 688, 429 N.E.2d 1158, 1159 (Ct.App.1981); see also Smith v. Russell Sage College, 54 N.Y.2d 185, 192-93, 445 N.Y.S.2d 68, 71, 429 N.E.2d 746, 750 (Ct.App.1981). "This bar against later claims based upon the same cause of action is, however, subject to certain limitations, one of which is that it will not be applied if the initial forum did not have the power to award the full measure of relief sought in the later litigation." Davidson v. Capuano, 792 F.2d 275, 278 (2nd Cir. 1986) (emphasis added) (citing McLearn v. Cowen & Company, 48 N.Y.2d 696, 698, 422 N.Y.S.2d 60, 61, 397 N.E.2d 750, 751 (Ct.App.1979)).
Plaintiff asserts that her Title VII suit is not barred by the prior state court proceeding, even though the claims are based on the same "factual grouping," because she could not have raised the Title VII claim in that forum. At the time the state court action was filed, and at the time the summary judgment decision was issued, the plaintiff's complaints with the New York State Division of Human Rights and the Equal Employment Opportunity Commission were still pending. Plaintiff correctly states that the filing of a complaint with the EEOC is a condition precedent to filing a Title VII action in federal court. Delaware State College v. Ricks, *107 449 U.S. 250, 256, 101 S.Ct. 498, 503, 66 L.Ed.2d 431 (1980); 42 U.S.C. § 2000e-5(e). In fact, the plaintiff did not even receive the required "Right to Sue" letter from the EEOC until May 3, 1989. See 42 U.S.C. § 2000e-5(f)(1). Moreover, Justice Hughes specifically stated that "any damages caused to the plaintiff as a result of sex discrimination will be addressed by the Division of Human Rights." Nov. 1, 1988, Decision of Hughes, J. Vol. I of SCR at 7.
The defendants maintain that the federal suit is barred because the Title VII claims could have been brought in the state court if the plaintiff had only employed better timing in the filing of its actions. Putting aside the issue of whether Title VII claims may be brought in state court, defendants' argument must fail. As is evident by a reading of Justice Hughes' decision, many of the plaintiff's allegations were dismissed for the sole reason that they occurred outside of the applicable statute of limitations period. Further delay by the plaintiff in asserting her claim in state court would have resulted in even more of her factual assertions being placed outside of judicial consideration. Under these circumstances it is clear that the plaintiff's claims under Title VII could not have been included in the state court proceeding without causing substantial injury to her state law tort claims. Therefore, the doctrine of res judicata does not act as a bar to this suit.

D. Title VII Limitations Period
An individual who alleges unlawful discrimination pursuant to 42 U.S.C. §§ 2000e-2 and 2000e-3 is required to file a discrimination complaint with the EEOC within 180 days of the occurrence of the allegedly unlawful acts. However, if the proceedings are instituted through a state agency, such as the New York State Division of Human Rights, which is authorized to grant relief, the statute of limitations for filing with the EEOC is extended to 300 days. 42 U.S.C. § 2000e-5(c). The parties agree that the plaintiff initially filed her complaint with the N.Y.S. Division of Human Rights and the EEOC on August 26, 1987. They also agree that 300 days prior to August 26, 1987, is October 30, 1986.
It is the defendants' position that if the court eliminates from its consideration: (1) the allegedly discriminatory and retaliatory conduct which occurred prior to October 30, 1986, as time barred and (2) the plaintiff's claims concerning the de-funding of the QWL Committee in the collective bargaining agreement, then all that is left of plaintiff's claims on summary judgment are "conclusory allegations of wrongdoing unsupported by any factual information." Union Defendants' Mem. of Law at 37. In response, plaintiff asserts that she has alleged sufficient acts of discrimination within the 300-day time period to make out each of her claims. Secondly, the plaintiff asserts that the 300-day limitations period does not apply because she has alleged a continuing pattern of sexual harassment which started in June of 1984 and continued through May of 1988.
The law with respect to "continuing violations" in the Second Circuit was recently summarized by the court in Blesedell v. Mobil Oil Co., 708 F.Supp. 1408, 1414-15 (S.D.N.Y.1989). There the court stated:
When an employer engages in a continuous practice and policy of discrimination, "the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." Miller v. International Tel. & Tel. Corp., 755 F.2d 20, 25 (2d Cir.), cert. denied, 474 U.S. 851, 106 S.Ct. 148 [88 L.Ed.2d 122] (1985). A continuing violation, however, may not be based on the continuing effects of an earlier discrimination, United Air Lines v. Evans, 431 U.S. 553, 558, 97 S.Ct 1885 [1889, 52 L.Ed.2d 571] (1977), or on a completed act of discrimination. Delaware State College v. Ricks, 449 U.S. 250, 257, 101 S.Ct. 498, 503 [66 L.Ed.2d 431] (1980). The determination as to whether or not a continuing violation exists must be made on a case-by case basis. Id. at 258 n. 9, 101 S.Ct. at 504 n. 9.... The courts of this circuit consistently have looked unfavorably on continuing violation arguments.... Indeed, only "compelling circumstances" will warrant application of the exception to the statute of limitations.... *108 To establish a continuing violation, "a plaintiff must show `a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the [limitations] period.'"
(Footnote omitted). After reviewing the allegations contained in the complaint, the additional assertions made in plaintiff's affidavits, and taking into consideration the fact that there has never been any discovery in this suit, this court holds that plaintiff has made a showing of the existence of a continuing violation of Title VII by the defendants sufficient, at this time, to avoid the application of the 300-day Title VII limitations period. The court holds that it is best to permit the parties to go forward with discovery so that any subsequent decisions may be made on a more complete factual record.

IV. Conclusion
The court has determined that plaintiff has made out prima facie claims of sexual harassment and retaliation, pursuant to Title VII, as against defendants Puma and Bischert. Moreover, the plaintiff has set forth a prima facie claim that defendant Gibbs acted to retaliate against her in violation of Title VII. These allegations are supported by sufficient factual assertions to create material issues of fact and thereby avoid dismissal on defendants' motions for summary judgment. However, the court holds that the state court's finding, with respect to plaintiff's discharge, collaterally estops her from relitigating that issue in this court. Accordingly, the defendants' motions for summary judgment are denied, as set forth above, without prejudice to renew after the conclusion of discovery.
IT IS SO ORDERED.
NOTES
[1] 42 U.S.C. § 2000e-2, in applicable part states:

(a) Employer practices. It shall be an unlawful employment practice for an employer
(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin....
(c) Labor organization practices. It shall be an unlawful employment practice for a labor organization
(1) to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color, religion, sex, or national origin;
(2) to limit, segregate, or classify its membership or applicants for membership, or to classify or fail or refuse to refer for employment any individual, in any way which would deprive or tend to deprive any individual of employment opportunities, or would limit such employment opportunities or otherwise adversely affect his status as an employee or as an applicant for employment, because of such individual's race, color, religion, sex or national origin; or
(3) to cause or attempt to cause an employer to discriminate against an individual in violation of this section.
42 U.S.C. § 2000e-3(a) states:
(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings. It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on-the-job training programs, to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this title [42 U.S.C. §§ 2000e2000e-17], or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title [42 U.S.C. §§ 2000e2000e-17].
[2] The complaint asserts that these individuals and entities are "employers" or "labor organizations" as those terms are defined in 42 U.S.C. §§ 2000e(b) and (d) respectively.
[3] The parties agree that Bischert became Council 82's president in September of 1983 and executive director in May of 1985a position which he held until the summer of 1989. Puma served as Chairman of the Correction Policy Committee of Council 82 from the earliest allegations in the complaint until September of 1985 when he was elected president.
[4] See Morris Affid. par. 7, Vol. III of State Court Record ("SCR") at 111; McLaughlin Affid. par. 10, Vol III of SCR at 14. Richard Morris has supported the plaintiff's claims of sexual discrimination and retaliationsupplying affidavits and testifying on her behalf. Morris has recently filed a claim with the New York State Division of Human Rights which asserts that he was retaliated against because he refused to cooperate with the defendants' discriminatory conduct with respect to the plaintiff. See Exhibit B, February 19, 1990, Affidavit of Plaintiff's Attorney.
[5] It should be noted that in extensive affidavits the defendants strongly dispute almost all of the factual allegations asserted by the plaintiff.
[6] At this point in the litigation the court is not making a determination as to whether the burdens of proof as outlined in McDonnell Douglas or Price Waterhouse v. Hopkins, ___ U.S. ___, 109 S.Ct. 1775, 1790, 1795, 104 L.Ed.2d 268 (1989), will apply to this case. See generally, Grant v. Hazelett Strip-Casting Corp., 880 F.2d 1564, 1568-69 (2nd Cir.1989). In any event, the McDonnell Douglas and its progeny provide appropriate guidance on this motion for summary judgment.
[7] To the extent that the plaintiff asserts a claim against defendant Gibbs for sexual harassment, it is hereby dismissed for failure to state a prima facie case.