**Sharon HARPER, Plaintiff,**

v.

**METROPOLITAN DISTRICT COMMISSION, Defendant.**

**No. CIV.A 3:96CV2171 (AVC).**

United States District Court, D. Connecticut.

March 16, 2001.

**472**

Sharon Harper, Hartford, CT, pro se.

Anthony J. Palermino, Gary R. Atkinson, Hartford, CT, for Metropolitan Dist. Com'n

## MEMORANDUM OF DECISION

COVELLO, Chief Judge.

This is an action for damages and equitable relief alleging wrongful denial of promotion in employment based on race and/or gender, wrongful termination of employment based on race and/or gender, other incidents of disparate treatment, retaliation and post-employment retaliation. It is brought pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) ("Title VII"). In addition, the complaint alleges violations of the United States Constitution pursuant 42 U.S.C. §§ 1981 and 1983, and violations of common law precepts concerning defamation, false light invasion of privacy and intentional infliction of emotional distress.

On August 22, 23, 24, 29 and 30, 2000, the parties tried to a jury the Title VII post-employment retaliation claim, the § 1983 claims, and the common law claims of defamation and false light invasion of privacy.[1] The jury thereafter returned a verdict for the plaintiff on all counts except for the Title VII claim, and awarded her 1.6 million dollars in compensatory damages in connection with her § 1983 claims and her claim of false light invasion of privacy, 1.6 million dollars as general damages for defamation, and 1.6 million dollars in punitive damages—for a total award of 4.8 million dollars.

Simultaneously, the parties tried to the bench the Title VII claims of disparate treatment in employment based on race and/or gender, to include wrongful denial of promotion and termination, and the claim of retaliation.[2] On November 6, 2000, the parties submitted proposed findings of fact and conclusions of law. In accordance with Federal Rule of Civil Procedure 52(a), the court makes the following findings of fact and conclusions of law, and renders judgment in favor of the defendant on the claim of disparate treatment in employment based on race and/or gender. The court, however, renders judgment for the plaintiff on the claim of retaliation in part.

### FINDINGS OF FACT

The plaintiff, Sharon Harper is an African–American woman formerly employed by the defendant, Metropolitan District Commission ("the defendant" or "the MDC"). At all relevant times herein, the plaintiff was also a member of the Board

---

1. During trial, the plaintiff withdrew her claims under 42 U.S.C. § 1981 and, at the close of evidence, the court dismissed the claim of intentional infliction of emotional distress for want of evidence of extreme and outrageous conduct by the defendant.

2. Because the plaintiff's claims of disparate treatment and retaliation arose prior to 1991, she did not have a right to claim a jury trial or seek compensatory or punitive damages. *See Postema v. Nat'l League of Professional Baseball Clubs,* 998 F.2d 60 (2d Cir.1993). Accordingly, these claims were tried to the bench, with relief limited to that arising in equity.

of Directors for the New London Chapter of the National Association for the Advancement of Colored People, Secretary for the National Council of Negro Women, a member of the League of Women Voters, a member of the Confederation of Democratic Women, and head of minority affairs for the Society of Women Engineers. The defendant is a municipal corporation chartered under the laws of the state of Connecticut that performs water supply maintenance, sewer services, and resource recovery. It is composed of eight member towns in Connecticut that include Hartford, West Hartford, East Hartford, Rocky Hill, Wethersfield, Newington, Bloomfield and Windsor.

On November 5, 1985, the plaintiff, who had a Bachelor's degree in civil engineering and approximately five years of related work experience, commenced employment with the defendant as a grade 10, level 3 project engineer. In this capacity, the plaintiff was paid approximately $30,000 per year and was responsible for drafting various hydraulic designs and specifications, reviewing bids for sewer construction, and solving engineering problems arising during sewer construction. She was supervised by one Richard Newton, a program engineer who, in turn, reported to one Neil Geldof, the director of engineering services. Both Newton and Geldof are Caucasian males. The plaintiff was both the first woman and the first African–American woman ever employed as a engineer by the defendant. At the time, Newton supervised fifteen engineers, four of whom were African–American men.

### 1. *Gender–Related Insensitivity*

Soon after arriving at the MDC, the plaintiff encountered incidents of general, gender-related insensitivity.[3] During a seminary on piping, an outside consultant drew an offensive drawing that depicted a circle with a dot in the center and two stick men holding the circle on each side. According to the consultant, the image depicted "two men [walking a-breast]." (Tr. at 34). In the backdrop of laughing male co-workers, the same consultant, during an instruction on heat reciprocity between adjoining pipes, likened the activity to sexual intercourse. The plaintiff, having been offended by the consultant's remarks, complained to Geldof. In response, Geldof purportedly telephoned the consultant but nevertheless allowed him to return. In still another incident, the plaintiff's co-workers casually discussed in her presence the events of a MDC Christmas party where blindfolded party-goers weighed a naked women's breasts with their hands, and guessed the women's cup size.

The plaintiff, as the minority affairs director for the Society of Women Engineers, was also subjected to interoffice scorn by co-workers because she attended a series of society meetings with MDC permission during the workweek. In her presence, male co-workers touted the arrangement as "reverse discrimination."

### 2. *The Application For Promotion*

In August, 1986, the defendant announced an opening for the position of grade 11, level 4 project engineer. The plaintiff, who had received average to above average performance ratings[4], expressed interest in applying for the position. By way of letter dated September 19, 1986, one Helmut Traichel, a senior personnel technician, informed the plaintiff that she was one of the top five candidates

---

**3.** The plaintiff also testified that she was groped and physically threatened. The court finds this testimony incredulous.

**4.** In her first 90 day employment evaluation, Newton rated the plaintiff's job performance as average to above average.

selected to be interviewed for the position. Traichel sent a copy of the letter to Geldof.

On or around September 20, 1986, the plaintiff obtained a job description for the level for project engineer position. The job description stated that the position required a Bachelor's degree in civil or mechanical engineering plus related work experience. The plaintiff met the requirements[5] and, after securing the job description, returned to her office cubicle where Newton's secretary, Jerry Murphy, asked her why she had gone to the personnel office. The plaintiff told Murphy of her interest in the new position. Thereafter, the plaintiff testified that her situation at the MDC, in her view, became increasingly difficult. In her opinion, Newton and Geldof began creating problems for her in the hope of "stacking" her personnel file with negative information and, in this way, derail her chances for promotion.

## A. The Elm Court Project

According to the plaintiff, the first salvo in the campaign against her promotion came by way of two written warnings she received after she engaged Newton and Geldof on the issue of which department engineer would review her work on a project known as Elm Court. Specifically, the plaintiff was assigned a difficult project known as Elm Court. The project concerned a neighborhood in Windsor, Connecticut, where residents did not have access to an underground sewer and had relied on an above ground sanitary system. The system was nearing exhaustion and a danger existed that effluent would seep into a nearby stream. The MDC therefore needed to develop a plan to service the neighborhood.

The plaintiff studied the problem and, drawing on principles of mechanical engineering, designed a solution that called for either a pump station to draw out the effluent, or the construction of an underground connection to a nearby gravity sewer. On or around September 25, 1986, the plaintiff took her design plans[6] to Newton and asked if both he and another department engineer, one Lebert Thomas ("Thomas"), could review them. Thomas, an African-American male, had expertise in mechanical engineering.

Newton was responsible for determining the appropriate engineer to conduct the review. Newton asked the plaintiff to leave the design plans with him, and told her that he would assign another department engineer, one Luis Alvarado, a Latin-American male, to review the design. Newton believed that Alvarado was the

---

**5.** At trial, Newton testified that the position of level 4 project engineer required applicants to have a professional engineering license. (Tr. at 530, 649–50). The plaintiff was not licensed and, therefore, the MDC argued that she was not qualified for the position. Because, however, the personnel department screened the plaintiff's background and selected her to be interviewed for the position, the court finds that a professional engineering license was not a requirement for the position and that the plaintiff was qualified for the position. In further support of this finding, the court notes that the MDC hired Lebert Thomas as a level 4 project engineer at or around the same time the plaintiff was hired

and, at this time, Thomas did not have a professional engineering license.

**6.** Design plans or "the design report" is a preliminary outline of a sewer project that the public has requested and the MDC has determined to be feasible. It consists of a draft layout of the proposed project, the number of people it will serve, a cost estimate, and a report stating how many people living in the area of construction are interested. Once the design report is approved and the project is funded, the engineer next prepares plans and specifications and a draft contract for advertising and bidding. Once the MDC has selected a contractor through a bidding process, the project goes to construction.

appropriate person to handle the review because Alvarado had been at the MDC for twenty-five years and had reviewed countless pump designs. The plaintiff did not believe that Alvarado was an appropriate person to handle the review because, in the plaintiff's opinion, Alvarado did not have expertise in mechanical engineering and had recently asked her and Thomas to review a design with a similar problem. Consequently, the plaintiff refused to give the design documents to Newton, and persisted in her request for Thomas. In response, Newton refused to defer to the plaintiff's preference for Thomas.

The plaintiff believed that Newton simply didn't want her to be supervised by an African–American. Unhappy with Newton's order, the plaintiff invited Newton to join her as she raised the issue with Newton's boss, Neil Geldof. Newton declined the invitation.

The plaintiff thereafter traveled to Geldof's office where, according to the plaintiff, Geldof was originally receptive to her concerns, and offered to review the project himself. Geldof's attitude changed, however, when Newton appeared at Geldof's office. At this time, Geldof, together with Newton, berated the plaintiff for her "unfamiliarity" with MDC procedures.

The plaintiff became extremely upset and went to see Geldof's boss, the MDC Deputy Manager, Harry Covey. Covey listened to the plaintiff and told her to apologize to Newton and Geldof if she wanted to get along with them. The plaintiff thereafter apologized and received permission to take the following day off as a personal day. Prior to the September 25, 1986 exchange, the plaintiff enjoyed a good working relationship with both Newton and Geldof. (Tr. at 69–70).

### B. *Written Warnings*

Upon her return to the office in late September, the plaintiff received written warnings from both Newton and Geldof concerning her insubordination. In response to the warnings, the plaintiff asked to meet with the District Manager, Bernard Batycki. Batycki agreed to see her immediately and summoned the Director of Personnel, David Andrews, to attend the meeting. During the meeting, which lasted three hours, the plaintiff told Batycki and Andrews that she felt that "the incidents were racially and gender motivated." (Tr. at 64–65). Batycki told the plaintiff that he didn't believe that the incidents were motivated by either race or gender,[7] and challenged her to get 10 people who would agree with her, stating:

> [P]erhaps you feel this way because you haven't been here that long, so go ask some of the old timers, and then I want you to report back to me.

(Tr. at 65). Batycki then asked Andrews to follow up with the plaintiff on her claim that her supervisors were trying to derail her chances for promotion because of her race and/or gender. Andrews, in turn, assigned the follow-up investigation to the Assistant Director of Personnel, Margaret Roughan, who was also the affirmative action officer. Batycki never asked the plaintiff to investigate her own charge of discrimination other than to survey the "old-timers" at the MDC. In fact, Batycki explicitly told the plaintiff that she was not to act as an affirmative action officer. (Tr. at 65).

On October 9, 1986, Andrews sent the plaintiff a memo withdrawing the warnings from her personnel file. The memo stated that because the plaintiff had apologized to

---

**7.** The Rev. Paul Miles Ritter, a commissioner of the MDC, testified at trial that he received letters from MDC employees complaining about racial discrimination. Rev. Ritter testified that he encountered resistance in bringing these complaints to the attention of Batycki. (Tr. at 290).

supervisors and acknowledged MDC policy regarding the assignment of design review, the warnings were no longer necessary and would be removed.

### C. *The Plaintiff's Annual Evaluation*

In the plaintiff's view, the second shot in the campaign against her promotion came by way of her annual performance evaluation. On September 30, 1986, Newton met with the plaintiff and rated her work as acceptable but told her that he was concerned with her recent failure to timely turn-in work and follow his direction. In response, the plaintiff told Newton that if the evaluation reflected this criticism, it would adversely affect her chances for promotion. Newton did not mention the plaintiff's recent failings on the evaluation form, and rated the plaintiff's job performance as average to above average. In Newton's opinion, the plaintiff's difficulties were too recent to be placed on an evaluation that covered an entire year. The plaintiff nevertheless disagreed with the evaluation, and refused to sign it. ·

### D. *Promotion Opportunity Becomes Frozen*

In early October, 1986, the plaintiff interviewed for the promotion with Newton and Geldof. Newton and Geldof were responsible for making the promotion decision. Later, in mid-October 1986, Batycki ordered a freeze on all hiring pending the completion of a wage and classification study for the entire MDC. Consequently, the promotion sought by the plaintiff was placed on hold.[8]

### 3. *The Group Investigation*

Over the month of October of 1986, the plaintiff pursued the survey that Batycki had asked her to conduct, and testified that she found approximately fifteen other MDC employees who believed they had experienced some form of discrimination at the MDC, but only five who were willing to step forward. Instead of referring the five to Andrews for his "follow-up" investigation, the plaintiff took it upon herself to conduct the investigation and, in the process, organized the five into a group. These five individuals were Lebert Thomas, Eilzabeth Monts, Cheryl Eubanks, Radames Vasquez[9], and Julia Hudson ("the group").

. During October, group members met and discussed their experiences at the MDC and their belief that the MDC discriminated based on race. They prepared an informal report, and arranged to meet with MDC management on November 12, 1986.

### 4. *The Plaintiff's Job Performance*

Meanwhile, the plaintiff was having more and more difficulty with her job. In early October of 1986, the plaintiff was responsible for a number of major projects, including Elm Court, a special project known as FGA that concerned a computer generated water distribution model ("the FGA·project"), and a sanitary sewer design project at Hunter Drive in West Hartford ("the Hunter Drive project.") The plaintiff was also responsible for a number of minor design projects, including the review of developer plans for a project known as Ethan Commons, and three smaller projects known as Mills Lane, Fenn Road, and Pine Hill. As of early October, 1986, the plaintiff still had not submitted the design plans for the Elm Court project that she had stated were complete at her September 25 meeting

---

8. The plaintiff testified that, at or around this time, Roughan told her that she had the promotion. The court finds, however, that Roughan never so advised the plaintiff.

9. Vasquez withdrew from the group shortly after the first meeting with Andrews and Roughan.

with Newton. On October 3, 1986, the plaintiff sent Newton a memo requesting an extension of time until October 8 to submit the Elm Court design plans.[10] Newton granted the time requested. According to Newton, project deadlines were not rigid, but were simply goals or milestones. The new due date, i.e., October 8, would come and pass without the promised submission. In late October, the plaintiff would again write to Newton, informing him that the Elm Court design remained incomplete because a pump manufacturer had yet to verify whether an actual pump existed that matched her theoretical pump design. In Newton's view, the plaintiff did not need to get manufacturer verification to complete the design plans.

On November 5, 1986, Newton approached the plaintiff with respect to Elm Court. The plaintiff told Newton that her progress was slower than expected because she was ill and had been out sick. The plaintiff then promised Newton that she would have the Elm Court design plans to him by November 14, 1986. In response, Newton told the plaintiff that, if she was ill, she should be at home. The plaintiff replied that she could not be at home because she had utilized all of her sick leave. Newton then told the plaintiff that, as a sick person, MDC policy required her go home.

### 5. The November 12 Meeting & Group Report.

During the month of October, the plaintiff investigated alleged MDC discrimination and, together with other group members, prepared an informal report that identified the issues as: (a) selective training based on race [11]; (b) disparity in hiring based on race; (c) selective use of seniority in promotion based on race; (d) racial harassment; (e) steering of minority employees into lower paying jobs; and (f) retaliation in the form of low work evaluations, verbal harassment, and reprimands for any employee who complained about these conditions. The report stated that there was a lack of affirmative action at the MDC and that a lack of minority representation in top positions at the MDC constituted an "atrocity." Further, the report gave specific examples of the disparities complained of, and offered the following statement concerning "Harassment, Intimidation, and Unprofessional [Conduct]":

> When it is known that an employee of Color will not readily accept certain unorthodox attitudes because those attitudes go against the employees moral fiber and personal integrity, that employee is riddled with all types of harassment, intimidation, insults, and unprofessionalism [sic] by supervisors and co-workers as a result of non-conformance.

(Plaintiff Ex: 2 at 7). On November 12, 1986, the group presented the report's findings to the Director of Personnel, David Andrews, and the Assistant Director of Personnel, Margaret Roughan. Directly after the meeting, Andrews asked Roughan to investigate the group's allega-

---

10. On the same day, i.e., October 3, 1986, the plaintiff sent Newton two other memos, one of which stated that the plaintiff's progress on the FGA project would be delayed because of a lack of computer facilities and because of her work on Elm Court and Mills Lane. The other memo stated that her work on the Hunter Drive project would be delayed because of Elm Court.

11. At trial, the evidence demonstrated that, at least with respect to the plaintiff, training opportunities were available. In fact, the MDC approved the plaintiff's request for funding to enroll in a review course for the professional engineer's examination, the MDC sent the plaintiff to Kentucky to learn about a special water distribution system, and the MDC sent the plaintiff to a two day seminar that concerned women in engineering.

tions and report back to him. Newton conferred regularly with the personnel department regarding the plaintiff's activities. As Newton testified at trial, "it was both a give and take situation." (Tr. at 580).

### 6. November 14 Encounter

Two days after the meeting, i.e., on November 14, 1986, Newton approached the plaintiff with respect to her progress on Elm Court. The plaintiff had previously promised Newton that the design plans would be finished by the 14th. When the plaintiff explained that the plans were incomplete and that her progress was slower than expected because she had not been well, Newton asked the plaintiff to bring him a note from a doctor. Several days later, the plaintiff presented Newton with a doctor's note dated November 26, 1986 that concerned a three day period in which she was absent from work in October. The note certified that the plaintiff was fit for normal work after October 27, 1986. The plaintiff perceived Newton's request as more harassment because, during the previous month, Newton had told her not to worry about the note. Newton, however, did not ask the plaintiff for a note regarding her October illness, but for a note stating whether she could do her job.[12]

### 7. The MDC Investigation & Retaliation

Directly after the November 12 group meeting with personnel, Andrews asked Roughan to investigate the group's claims of discrimination. On November 20, 1986, Andrews, in furtherance of the investigation, wrote to Thomas and requested the group's report and all notes and materials generated in connection with the November 12, 1986 meeting. Andrews believed the materials would assist him in "getting to the bottom of the issue[s]." (Tr. at 486). On November 24, 1986, the group, in fear of retaliation, responded by way of letter to Andrews, and there declined to provide the requested materials, observing that "you and the Assistant Director of Personnel took relevant notes of the discussion and we feel those notes should suffice." (Plaintiff's Ex. 4). The group requested a second meeting with Andrews and Roughan and, on December 8, 1986, the parties met.

### 8. Post–Meeting Retaliation

At the December 8, 1986 meeting, the group turned over the materials requested and complained of harassment from co-workers and supervisors following the previous meeting on November 12, 1986. In this regard, the plaintiff reported that Newton was harassing her and, in particu-

---

12. Newton believed that the plaintiff's health issues might be female related, and therefore thought she might feel more comfortable discussing her health issues with another woman instead of him. Accordingly, he directed the plaintiff to confer with Roughan regarding her illness, and would later ask Roughan to get further medical documentation from her. When Roughan called the plaintiff into her office and asked for the documentation, the plaintiff became hostile. As Roughan testified:

> [e]very time I tried to say something, either [the the plaintiff] would talk over it, or she wouldn't listen. She continued— she

looked at her watch during the meeting, kept looking at her watch. Then all of a sudden that's when she said, well, I'm going to have to tell Dave [Andrews] that you're badgering me.

. . . . .

[Roughan told the plaintiff that the meeting was over. The plaintiff, however] continued to sit in the chair. [Roughan] again told her that the meeting was over, that she could leave. She did not leave [her] office. [Roughan] eventually got up and had to leave [herself].
(Tr. at 246).

lar, had demanded medical documentation from her relating to her illness that he had previously told her was not necessary.

Following the December 8, 1986 meeting, Newton again approached the plaintiff with respect to her assignments. Specifically, as previously discussed, the plaintiff was responsible for a number of other projects in addition to Elm Court, including a project known as Ethan Commons. Newton had instructed the plaintiff to stop working on Ethan Commons because it was a low priority and to concentrate on Elm Court, a high priority. In response, the plaintiff asked Newton to assign her a priority list with respect to her remaining projects. Newton refused to make such an assignment and, in a loud manner, told the plaintiff to prioritize her own projects. Newton also warned her that if she wasn't able to do this, then she wasn't qualified for her current position.

The plaintiff considered the incident another episode of harassment, and went about to draft a memo to the personnel department and to the District Deputy Manager, Harry Covey. Shortly thereafter, Newton came upon the plaintiff while she was drafting the memo, and noticed that she was working on something unrelated to her job. Because the engineering department had only one word processor for 15 engineers, Newton asked the plaintiff what she was doing. The plaintiff answered that she was following the personnel department's instruction to her to "inform them if there was any further problems." (Tr. at 96). Newton told her to get off the computer "right now." (Tr. at 97).

The plaintiff pressed on with her complaints to personnel, stating at trial that:

[E]ven though I was being harassed and retaliated [against,] I wasn't too afraid to follow up on the issues and to ask them to have something done about it. I refused to lie down and take being

harassed and discriminated against and mistreated.

(Tr. at 99–100). From Newton's point of view, the so-called "harassment" suffered by the plaintiff had nothing to do with her race or gender. Rather, it stemmed from her failure to do her job. As Newton testified at trial,

All I wanted her to do was turn in her projects so we could move the projects [a]long. She refused to do so. Every time I asked her to turn in a project, she'd give me one of those memos that says its not ready, but it'll be ready by such and such a date. In retrospect, I probably gave her too many extensions, but I didn't—I wanted to see the projects. That was my main concern.

(Tr. at 582).

### 9. *The MDC Investigations*

Roughan investigated the plaintiff's claims of discrimination in promotion and the group's collective claims of discrimination as disclosed at the November 12, 1986 meeting. Roughan's investigation consisted of interviewing group members and management. However, Roughan never interviewed group members Thomas and Eubanks, and without elaborating, simply told Monts that she didn't have a complaint. Roughan also never interviewed Newton and never submitted a written report to Andrews. At the conclusion of the "investigation," Roughan did not find any evidence to support the claims, and reported this to Andrews. Further, Roughan and Andrews investigated the plaintiff's claims of harassment following the November 12 and December 8 meetings and, in the end, found fault with the plaintiff. Specifically, on December 11, 1986, the plaintiff met with Andrews, Roughan, Newton, and one Peter Hendricks, the union steward. There, Andrews told the plaintiff the results of the investigation and that her supervisors

were complaining about her and, in particular, that:

> [F]rom the supervisor standpoint, her work was not coming up to par because of absences and [her] performing other things during the workday, and also the fact that at times she was ignoring the chain of command and reporting down to the personnel office, or coming in for information, or whatever... [She] was also going to other areas asking for information, interrupting the work in other departments in the building during work time.

(Tr. at 490). On the following day, Andrews handed the plaintiff a letter of reprimand that stated in relevant part that:

> The District's investigation has concluded and we find absolutely no evidence of harassment or improper treatment.
>
> In order to have the harmonious relationship you requested in your memorandum, I directed you to do the following:
>
> 1. Performance of work is the top priority. Perform your job functions and do so in a timely fashion.
> 2. Recognize departmental chain of command and your supervisor. He shall be expected to perform his job as you and all others are expected to perform yours.
> 3. Cease utilizing MDC word processing and other equipment for non-work assignment matters.
> 4. Do not spend work time drafting documents which contain unsubstantiated claims. This is not what you are being paid to do.
> 5. Follow District procedures concerning meetings with the Personnel Department. You are not to leave your work area without permission to come

to my office, nor are you to demand meetings and/or enter personal offices in my department without having secured an appointment.

> This matter is concluded. If you have any questions please direct them to your bargaining representative.

(Joint Ex. 27).

### 10. *Elm Court, The Community Renewal Team & Suspension*

The plaintiff, in conjunction with the group, filed a race discrimination/unfair employment practices complaint with the Community Renewal Team. On January 7, 1987, the plaintiff informed Newton by memo that, due to her present workload, she would not be able to complete the FGA project until January 30, 1987. (Tr. at 574). By January's end, the FGA model would remain incomplete.[13]

Further, the plaintiff had yet to finish Elm Court. On December 1, 1986, the plaintiff told Newton that she had completed approximately 70–80% of the Elm Court requirements, but had not yet completed the plans and specifications. Newton wanted the "completed plans and specifications because [he] wanted to go to construction on the job." (Tr. at 582). Newton needed the "final plans, specifications, and contract documents." (Tr. at 701).

On February 3, 1987, Newton met with the plaintiff and reviewed her work on Elm Court that included draft plans and specifications and a draft contract. At the meeting, the plaintiff asked for a deadline of February 10, 1987 for submission of the completed plans because she was having trouble getting the drafting department to work on the project. Newton agreed to the extension and, in addition, told her

---

**13.** The plaintiff never completed the FGA model, claiming want of appropriate computer facilities.

that, since he planned to be out of the office until February 14, 1987, she could have until the 17th to complete the project. Newton then suggested some design changes and, on February 6, 1987, the plaintiff sent Newton a follow-up memo stating that, due to his suggested design changes, laborers would have to dig a test pit to check for water main conflicts and, accordingly, the agreed-upon deadline of February 17 might have to be extended to February 23. Further, on February 9, 1987, the plaintiff sent Newton a second memo reporting that the Elm Court documents had been stolen from her desk.

Meanwhile, on the same day, i.e., February 9, 1987, one Thomas Wright of the Community Renewal Team responded to the group's complaint and, in a letter to Andrews, summarized the complaint and told Andrews that the group's allegations were credible enough to warrant a review and investigation.

On February 17, 1987, Newton returned to the office and, upon meeting with the plaintiff, requested the Elm Court plans and specifications. The documents were not complete, however, because, in the plaintiff's opinion, she could not complete them because MDC laborers could not dig the test pit in time. Although the plaintiff had attempted to arrange for that work, labor supervisors told her that the project would have to wait until early spring because of cold weather and labor priorities. According to Newton, the plaintiff did not need a test pit to complete the plans and specifications.

On February 19, 1987, Andrews wrote back to Wright at the Community Renewal Team and informed him that the MDC employees who filed the complaint were currently utilizing the MDC's internal resolution mechanism. In addition, Andrews challenged Wright's further involvement, stating:

> The MDC is unaware of any jurisdictional basis for your proposed involvement and requests your statutory and/or legal authority.

(Plaintiff's Ex. 3).[14]

On the day following Andrews' response to Wright, i.e., February 20, 1987, the plaintiff was ordered to attend a meeting with Newton, Geldof and Stanley Johnson, the president of the union. At the meeting, Newton suspended the plaintiff for five days on account of her repeated delays and failure to make adequate progress on the Elm Court project, her refusal to accept both oral and written direction, and her poor behavior overall. (Tr. at 598–601). At the meeting, the plaintiff asked for a written letter of suspension. In response, Newton told her that he would follow-up with a letter at a later time. When the plaintiff refused to leave without a letter, the Deputy Manager, Harry Covey, ordered the plaintiff to leave. This was the first time the MDC ever suspended an engineer.

### 11. The Plaintiff's Termination & The CCHRO Complaint

In early March 1987, Newton told the plaintiff to give priority to a design report for a large gravity sewer planned for Hunter Drive in West Hartford, Connecticut. Newton asked the plaintiff to prepare a report for Hunter Drive summing-up the results of water and soil tests, the recommended layout for the design, and the cost for the project. On March 10, 1987, the plaintiff complained to Newton that computer disks had been stolen from her work area, and requested keys to lock her desk. Newton didn't believe the plaintiff and

14. On February 27, 1987, the CRT withdrew     from further involvement.

thought the plaintiff was simply trying to delay submission of the project.

On March 13, Newton sent the plaintiff a second memo ordering her to complete the Hunter Drive design report by Friday, March 20, 1987. The plaintiff ran into trouble with the deadline when a contractor told her that he could not test the soil in March, and one Robert Proctor, an employee of the Town of West Hartford, informed her that March was not a good time for water testing because of snow in the Hunter Drive area and because of high water tables.

At the same time, the plaintiff was pursuing a discrimination complaint against the MDC with the Connecticut Commission on Human Rights and Opportunities ("CCHRO"). While the plaintiff told group members that she needed to take a few days of vacation time to work on the complaint and to hire an attorney, the plaintiff never told Newton of her plans, and in fact, neither Newton nor any other manager at the MDC knew of her filing plans.[15] On Friday, March 20, 1987, the Hunter Drive project became due. The plaintiff, however, had taken that day off to work on her CCHRO complaint without first submitting the Hunter Drive project to Newton. Newton was disappointed, and testified that:

There had been too many deadlines and too many misses of deadlines. At some point I had to bring this thing to an end.

(Tr. at 618). On Monday, March 23, 1987, the plaintiff took the morning off to file the complaint with the CCHRO. Neither Newton nor anyone else in MDC management knew that the plaintiff was filing the complaint.

Upon arriving at the MDC at approximately 1:00 p.m., Newton asked the plaintiff for the Hunter Drive project, and she responded that she didn't have the project with her. Newton then asked the plaintiff to meet with him, Geldof and Stanley Johnson, the union president. At the meeting, Newton terminated the plaintiff's employment for poor work performance, that is, her failure to complete Hunter Drive.[16] As Newton testified at trial

I indicated to Ms. Harper that due to her inability to finish the work, her lack of following direction, and the fact that she had not turned in any projects or met any deadlines, in fact when I suspended her it didn't seem to help, when she came back matters were no better off than they were before that, that due to all those reasons, her services were no longer required.

(Tr. at 621). This was the first time the MDC ever fired an engineer.

---

**15.** The plaintiff testified that she very openly told co-workers of her filing plans and, in this regard, she has argued that Newton must have known, prior to firing her, that she filed a complaint with the CCHRO. The court finds this testimony inadequate to show that Newton, or any other MDC manager, knew of her filing plans. Earlier in this proceeding, the plaintiff testified that she and other group members were so concerned with retaliation from management that they refused to provide Andrews with a copy of the informal report they prepared for the November 12, 1986 meeting, even though Andrews had met with the complaining employees and knew

their identities. An individual so concerned with retaliation would have never allowed her filing plans to go beyond trusted fellow employees.

**16.** At trial, the plaintiff testified that she offered to retrieve from her car the completed design report for Hunter Drive, but that Newton refused to accept it. The court finds the plaintiff's testimony unworthy of belief. The plaintiff has never produced the completed Hunter Drive design report in this case or in a prior arbitration and, as Newton testified, he found an incomplete design report for Hunter Drive in the plaintiff's work area.

### 12. *Peter Reilly & The Promotion*

Ultimately, the MDC then selected one Peter Reilly for the position of project engineer 4, the job sought by the plaintiff. Unlike the plaintiff, Reilly is a Caucasian male. Unlike the plaintiff, Reilly also had an engineering license.

### 13. *The New Position*

After her employment termination, the plaintiff looked for another engineering position and, in November of 1988, the City of Hartford hired her as a civil engineer in which she worked as a construction division manager for the department of public works. The position paid $38,714. On March 17, 1989, after eighteen months on the job, Patricia Washington, an African–American woman and the director of personnel for the City of Hartford, fired the plaintiff.

## FURTHER FINDINGS OF FACT AND CONCLUSIONS OF LAW

Title VII makes it unlawful for an employer to discriminate against any employee with respect to an employee's terms or privileges of employment based on race or gender, among others. 42 U.S.C. § 2000e–2(a)(1). The plaintiff relies on two theories to show a Title VII violation: (1) disparate treatment and (2) retaliation for engaging in protected activity. The court considers each in order.

### 1. *Disparate Treatment*

The analysis for a disparate treatment claim, which requires proof of discriminatory intent or motive, is governed by the well known *McDonnell Douglas* framework. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this framework, the plaintiff:

> has the initial burden of establishing a prima facie case of discrimination... If she establishes a prima facie case, the

burden shifts to [the defendant] to articulate a legitimate, non-discriminatory reason for the adverse employment decision. If [the defendant] offers a legitimate, non-discriminatory reason for its actions, the burden reverts to [the plaintiff] to show [the] proffered reason was a pretext for discrimination.

*Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1315 (10th Cir.1999) (citations omitted).

### A. *The Plaintiff's Prima Facie Case*

The plaintiff's first burden under *McDonnell Douglas* is to establish a prima facie case of discrimination. The nature of the plaintiff's burden of proof is *de minimus. Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988). To make out a prima facie case, the plaintiff must show that: (i) she is a member of a protected class; (ii) she was qualified for the position; (iii) the defendant took adverse action against her; and (iv) the adverse action occurred under circumstances giving rise to an inference of discrimination. *See e.g., Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir. 1988); *Woroski v. Nashua Corp.,* 31 F.3d 105, 108 (2d Cir.1994).

### (i) *Protected Class*

The plaintiff is an African–American woman and therefore a member of two classes protected by Title VII.

### (ii) *Qualified for Position/Promotion*

The plaintiff was qualified for her position as a grade 10, level 3 project engineer. The plaintiff was also qualified for promotion to grade 11, level 4 project engineer.

### (iii) *Adverse Employment Action*

The plaintiff suffered at least three different adverse employment actions. Spe-

cifically, the MDC: (a) denied her a promotion to which she was qualified, (b) suspended her for five days; and (c) terminated her employment.

### (iv) *Inference of Discrimination*

■ The plaintiff has raised an inference of discrimination. The plaintiff was the first and only African–American woman ever employed by the MDC as an engineer. During her first year of employment, she received average to above average performance ratings and enjoyed a good working relationship with her supervisors. After she expressed interest in a promotion, however, her supervisors subjected her to job related discipline that culminated in her suspension and employment termination, distinguishing her as the only MDC engineer ever to have been so aggrieved. Under these circumstances, the plaintiff has demonstrated facts sufficient to draw an inference of race and/or gender discrimination. *See e.g., Getschmann v. James River Paper Co., Inc.,* 822 F.Supp. 75, 77 (D.Conn.1993); *Young v. Bank of Boston,* No. 3:93CV1642, 1995 WL 908616, *3 (D.Conn. March 31, 1995).

### B. *The Defendant's Non–Discriminatory Reason*

■ To rebut an inference of discrimination established by the plaintiff's prima facie case, the defendant must articulate a legitimate, non-discriminatory reason for the adverse employment action. *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The defendant must state a "clear and specific" reason. *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985). Here, the MDC has stated that it took the actions condemned because "[t]he plaintiff refused to comply with the direct orders of [the d]efendant, failed to complete specified projects, and failed to cooperate with supervision." With this articulation, the

court concludes that the defendant has sufficiently rebutted the inference of discriminated raised by the plaintiff's prima facie case.

### C. *Pretext/Discrimination*

■ In the final stage of the *McDonnell Douglas* analysis, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the reason articulated by the defendant for the adverse action was false, and that the real reason for the action was illegal discrimination. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 507–08, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). In conducting this analysis,

> [t]he factfinder's disbelief of the reasons put forward by the defendant (particularly if disbelief is accompanied by a suspicion of mendacity) may, together with the elements of the prima facie case, suffice to show intentional discrimination. Thus, rejection of the defendant's proffered reasons will *permit* [but does not compel] the trier of fact to infer the ultimate fact of intentional discrimination... [and] no additional proof of discrimination is *required.*

*Id.* at 511, 113 S.Ct. 2742; *see also Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 120 S.Ct. 2097, 2106, 147 L.Ed.2d 105 (2000).

Having reviewed and weighed the evidence disclosed at trial, the court concludes that, while the plaintiff has succeeded in her prima facie case and has shown that the defendant's articulated reasons for the actions condemned are not entirely worthy of belief, she has nevertheless failed to convince the court that such actions were motivated by her race and/or gender. Of particular weight in this determination is the fact that the plaintiff, for almost one full year, enjoyed a very good working relationship with the very supervisors she claims so invidiously discriminated against her, i.e., Newton and Geldof

(Tr. at 69–70). That good relationship did not change when the plaintiff expressed interest in the promotion.[17] Rather, the plaintiff's troubles with Newton and Geldof began on September 25, 1986, after she engaged Newton on the issue of which department engineer should be assigned to review her work on Elm Court. During that engagement, the plaintiff challenged Newton's choice of Alvarado to conduct the review and she was plainly insubordinate. When Newton refused to defer to her choice of Thomas (an African–American engineer), the plaintiff appealed in vain to Newton's boss, Geldof. In achieving nothing on appeal but a letter of reprimand for insubordination, she would travel to the highest management authority at the MDC, change the agenda from that of her insubordination to her supervisor's discriminatory conduct, and there begin a fight that would lead to her own termination. The plaintiff's drive for political action and, in her view, needed reform at the MDC was thoroughly consistent with her many political affiliations, it became her primary concern, and it compromised her ability to focus on her work and timely complete her engineering assignments. The adverse employment actions she suffered were not imposed because of her race or gender, but because of her all encompassing struggle to fight what she perceived as discrimination at the MDC.

I. *Suspension.*

On February 20, 1987, the MDC suspended the plaintiff for five days. The stated reason for the suspension, accordingly to Newton, was the plaintiff's repeated delays and her failure to make adequate progress on Elm Court, her refusal to follow both written and oral direction, and her poor behavior overall. (Tr. at 598–601). Indeed, there were delays in moving Elm Court along and, in fact, the plaintiff requested multiple deadline extensions between October of 1986 and February of 1987. The plaintiff also requested extensions for the FGA project and Hunter Drive. Because the plaintiff did not timely turn in the majority of her assignments, there is ample evidence that, in this regard, she refused to follow Newton's direction.

There was also evidence that, prior to the suspension, the plaintiff boldly challenged management and behaved quite poorly. Commencing in October of 1986, and contrary to instructions from management, the plaintiff launched her own investigation into institutional discrimination at the MDC. The investigation distracted both her and her co-workers away from their job responsibilities, and it compromised the plaintiff's ability to make progress on her assignments.

The court is mindful of the evidence presented at this proceeding which pointed to gender bias at the MDC during the late 1980's. In response, the plaintiff was well within her rights to complain and oppose such conduct, and to seek redress through an internal complaint or a complaint filed with an outside agency charged with inves-

---

17. In or around August of 1986, the plaintiff expressed interest in an open position for a level 4 project engineer. On September 19, 1986, Helmut Traichel of the personnel department wrote to the plaintiff stating that she was one of five engineers selected to be interviewed for the position. On the same day, Traichel sent a copy of the letter to Geldof. On or around September 20, 1986, the plaintiff told Newton's secretary, Jerry Murphy, of her interest in the position. The plaintiff does not allege, however, that either Geldof or Newton treated her unfairly until September 25— weeks after she first expressed interest in the position, days after it can be definitively presumed that Newton and Geldof learned of her interest, but coincidentally, the very same day that she so insubordinately challenged Newton regarding the design review for Elm Court.

tigating and/or adjudicating Title VII violations.[18] She was not, however, entitled to initiate the kind of campaign and investigation that she chose to pursue, a campaign that constantly put in her conflict with management and strained her ability to do her job.

The MDC has never suspended an engineer for a failure to meet deadlines, and the plaintiff is no exception. The plaintiff's failure to meet deadlines was just one of several collateral and disruptive affects stemming from her change in focus from engineering to political reform. Consequently, the court concludes that the plaintiff has failed to demonstrate that the MDC suspended her on account of her race or gender.

## II  Job Termination

On March 23, 1987, the MDC terminated the plaintiff's employment for poor work performance after she failed to turn in a completed design report for Hunter Drive. As Newton stated at trial, the plaintiff was terminated for her-

> inability to finish the work, her lack of following direction, and the fact that she had not turned in any projects or met any deadlines, in fact when I suspended her it didn't seem to help, when she came back matters were no better off than they were before that, that due to all those reasons, her services were no longer required.

(Tr. at 621). Again, Newton's statement is not contrary to the evidence. Indeed, the evidence demonstrated that the plaintiff deliberately decided to take a vacation day on the very day the Hunter Drive design report became due. In advance of that vacation, the plaintiff did not tell Newton that she would be out, she did not arrange to submit the design report and, in fact,

she never submitted the completed design report. While the MDC never terminated an engineer for failure to meet deadlines— simply put:

> There had been too many deadlines and too many misses of deadlines. At some point [Newton] had to bring this thing to an end.

(Newton, Tr. at 618). Accordingly, the plaintiff has failed to demonstrate that her employment was terminated on account of her race and/or gender.

## III  Denial of Promotion

■ There is simply no evidence that the MDC denied the plaintiff a promotion on account of her race and/or gender. The evidence at trial demonstrated that, shortly after the plaintiff interviewed for the promotion, Batycki ordered a freeze on all hiring pending the completion of a wage and classification study. The plaintiff has not offered any evidence that the freeze was a sham imposed to deny her the promotion. Further, although the MDC lifted the hiring freeze and hired a Caucasion male, one Peter Reilly, for the position shortly after the plaintiff was terminated, the action does not bespeak discriminatory animus because the plaintiff and Reilly were not similarly situated, that is, Reilly was better qualified for the position because he had an engineering license. Accordingly, the evidence did not demonstrate that the MDC took the action condemned because of the plaintiff's race and/or gender.

## 2.  Retaliation

Title VII also makes it unlawful for an employer to discriminate against any employee for opposing any unlawful employment practice or for charging, testifying, assisting, or participating in a investiga-

18.  The plaintiff was also entitled to bring a Title VII claim for hostile working environ-  ment in this proceeding.

tion, proceeding, or hearing authorized under Title VII. 42 U.S.C. § 2000e–3(a). To establish a claim for retaliation pursuant to Title VII, a plaintiff need not prove that her underlying discrimination claim was valid in the first instance. *Sumner v. U.S. Postal Service*, 899 F.2d 203, 208–09 (2d Cir.1990). Moreover, Title VII is violated if "a retaliatory motive played a part in the adverse employment actions, even if it was not the sole cause." *Davis v. State University of New York*, 802 F.2d 638, 642 (2d Cir.1986). As with other Title VII claims, a claim of retaliation is examined using the familiar *McDonnell Douglas* burden shifting analysis. *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1177 (2d Cir.1996).

### A. The Prima Facie Case

To make out a prima facie case of retaliation, the plaintiff must show by a preponderance of the evidence:

(i) participation in a protected activity known to the defendant; (ii) an employment action disadvantaging the plaintiff; and (iii) a casual connection between the protected activity and the adverse employment action.

*Tomka v. Sheiler Corp.*, 66 F.3d 1295, 1308 (2d Cir.1995).

#### (i) Known Protected Activity

The plaintiff has argued that she engaged in protected activity known to MDC management on at least four occasions: (a) when she complained to MDC management of discrimination; (b) when she organized the group to pursue claims of discrimination; (c) when she filed a complaint with the Community Renewal Team; and (d) when she filed a complaint with the CCHRO.

##### (a) Complaint/MDC Management

The plaintiff's conduct in complaining to MDC management about discrimination is protected by Title VII, and it was known by the MDC.

##### (b) Organization of The Group.

■ The plaintiff's efforts in organizing the group were protected only to the extent such efforts did not interfere with the performance of her job. *Payne v. McLemore's Wholesale & Retail Stores*, 654 F.2d 1130, 1142 (5th Cir.1981); *see also Hochstadt v. Worcester Foundation For Experimental Biology*, 545 F.2d 222, 229–34 (1st Cir.1976). It is clear that, once the plaintiff identified potential group members, her decision to organize the group and to investigate the claims herself interfered with her ability to timely complete her work, and as such, this conduct was not protected.

##### (c) Complaint/Community Renewal Team

The plaintiff's conduct in filing a complaint with the Community Renewal Team is protected by Title VII, and it was known by the MDC.

##### (d) Complaint/CCHRO

The plaintiff's conduct in filing a complaint with the CCHRO is protected by Title VII. However, the filing was not conduct that was known to MDC management.

#### (ii) Adverse Employment Action

The plaintiff has argued that the MDC retaliated against her in three different ways: (a) by issuing a letter of reprimand to her on December 12, 1986, on account of her complaints of racial and gender discrimination; (b) by suspending her for five days on account of her complaint with the Community Renewal Team; and (c) by terminating her employment on account of her CCHRO complaint.

#### (iii) Causal Connection

■ The plaintiff has successfully demonstrated a causal connection between her

complaint to MDC management and the December 12, 1986 letter of reprimand, and a causal connection between her complaint to the Community Renewal Team and her suspension. *See e.g., Davis v. State University of New York,* 802 F.2d 638, 642 (2d Cir.1986) (proof of causal connection can be established by showing that the protected activity was followed closely by discriminatory treatment). Here, the December 12, 1986 letter of reprimand came almost concurrently with her claims to personnel that Newton was harassing her, and, with respect to her suspension, the MDC suspended the plaintiff one day after it responded to a discrimination complaint filed by the plaintiff with the Community Renewal Team.

In sum, the plaintiff has failed to establish a prima facie case of retaliation for organizing the group investigation because her efforts were not protected by Title VII. The plaintiff has also failed to establish a prima facie case of retaliation for filing a CCHRO complaint because the court has found that MDC management did not have any knowledge of that complaint in advance of the termination. The plaintiff has, however, succeeded in establishing a prima facie case that she was subjected to reprimand in retaliation for complaining to MDC management of discrimination and harassment, and a prima facie case that she was suspended in retaliation for filing a complaint with the Community Renewal Team.

### B. *The Defendant's Non–Discriminatory Reason*

To rebut an inference of retaliation established by the plaintiff's prima facie case, the defendant must articulate a legitimate, non-discriminatory reason for the adverse employment action. *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991). The defendant must state a "clear and specific" reason. *Meiri v. Dacon,* 759 F.2d 989, 997 (2d Cir.1985).

Here, the MDC stated that it took the actions condemned because "[t]he plaintiff refused to comply with the direct orders of [the d]efendant, failed to complete specified projects, and failed to cooperate with supervision." With this articulation, the court concludes that the defendant has sufficiently rebutted the inference of retaliation raised by the plaintiff's prima facie case.

### C. *Pretext/Discrimination*

█ In the final stage of the *McDonnell Douglas* analysis, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the reason articulated by the defendant for the adverse action was false, and that the real reason for the action was retaliation. *Saulpaugh v. Monroe Community Hospital,* 4 F.3d 134, 141 (2d Cir.1993).

Having reviewed and weighed the evidence disclosed at trial, the court concludes that the plaintiff has proven by a preponderance of the evidence that both the December 12, 1986 letter of reprimand, and the February 20, 1987 suspension were motivated at least in part by retaliatory animus.

### I. *December 12, 1986 Reprimand*

It is clear that, during the months of October and November of 1986, the plaintiff's demand for investigative action was coming into conflict with a management that resisted such inquiry.[19] MDC man-

---

**19.** The evidence of that resistance included: (1) MDC Commissioner Ritter's testimony that Batycki turned a deaf ear to complaints of discrimination; (2) a lackluster MDC investigation into claims of discrimination in which the affirmative action officer didn't bother to interview management and most members of the complaining group, and

agement depended on the plaintiff to do engineering work, and the plaintiff depended on MDC management to investigate her claims and protect her from retaliation. Both sides failed. By early December of 1986, the plaintiff had reported to personnel multiple instances of what she believed to be discrimination and harassment, and was looking for help. Newton, on the other hand, who routinely exchanged information about the plaintiff with the personnel department, was having trouble getting the plaintiff to finish her assignments.

On December 8, 1986, Newton confronted the plaintiff with respect to her projects, an argument ensued and, from the plaintiff's point of view, Newton harassed her, and shortly thereafter, barred her from using a word processor to complain to personnel about him. Four days later, the director of personnel would hand the plaintiff a letter of reprimand, informing her that personnel had investigated her claims and found no evidence to support them. The director also ordered the plaintiff, among other things, to timely complete her job assignments, to stop utilizing MDC word processing for non-work related matters (i.e., reporting harassment), and he forbid her from visiting the personnel department without his permission.

The reprimand disadvantaged and chilled the plaintiff's ability to engage in protected activity, that is, to complain, and it disadvantaged her ability to seek shelter from the one that she believed was unfairly harassing her. The court finds that, although the letter was issued pursuant to a legitimate objective in part, i.e., in that it directed the plaintiff to focus on the timely

completion of assignments, it was also issued in retaliation for the plaintiff's complaints of discrimination and harassment.

## II  *The Suspension*

What is most revealing of the true intention behind the suspension is the timing. Interestingly enough, Newton, who routinely exchanged information about the plaintiff with the personnel department, suspended the plaintiff on February 20, 1987, one day after Andrews, the director of personnel, responded to a discrimination complaint filed by the plaintiff with the Community Renewal Team. The court finds that the suspension was motivated at least in part by retaliatory animus and that, but for the complaint, the plaintiff would not have been subjected to such adversity.

## *EQUITABLE RELIEF*

The relief available to persons aggrieved by violations of Title VII for conduct occurring prior to 1991 includes "such affirmative action as may be appropriate, which may include, but is not limited to, reinstatement..., back pay, ..., or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e-5(g). The relief must arise in equity, as oppose to at law, and includes declaratory relief. *See e.g., Jackson v. Coker, Inc., A.J. Lynam,* 840 F.Supp. 1040 (E.D.Pa.1993).

The plaintiff has proven that the MDC issued a letter of reprimand to her, and suspended her, in retaliation for engaging in protected conduct and, as such, she has proven that the MDC violated her rights as secured by Title VII. The plaintiff has

didn't even bother to prepare a written report; and (3) Andrews February 19, 1987 response to Wright of the Community Renew-

al Team in which Andrews told Wright to back-off.

**490**

not proven, however, that either the letter of reprimand or the suspension caused her any financial loss. In this situation, the court would normally consider a nominal award. However, because nominal damages are not available for pre–1991 violations of Title VII, *see Griffith v. State of Colo. Div. of Youth Servs.*, 17 F.3d 1323, 1327 (10th Cir.1994), the court shall award the plaintiff a declaratory judgment that the MDC violated her rights as secured by Title VII.

### CONCLUSION

Based on the foregoing, the court renders judgment for the defendant on the plaintiff's Title VII claim of disparate treatment, and renders judgment for the plaintiff on the claim of retaliation, and declares that the plaintiff has proven that the MDC violated her rights as secured by Title VII. The court also orders the clerk of the court to enter judgment for the plaintiff on all claims that she prevailed by jury verdict.